**The CURTIS PUBLISHING COMPANY, Appellant,**

v.

**Felice GOLINO, Appellee.**

**No. 23385.**

United States Court of Appeals
Fifth Circuit.

Aug. 17, 1967.

Rehearing En Banc Denied
Sept. 27, 1967.

Philip H. Strubing, Philadelphia, Pa., R. Emmett Kerrigan, New Orleans, La., for appellant.

Russell T. Tritico, Morgan City, La., for appellee.

Before THORNBERRY and COLEMAN, Circuit Judges, and YOUNG, District Judge.

THORNBERRY, Circuit Judge:

This appeal presents the question whether, in the factual context of this case, assertion of jurisdiction over Curtis Publishing Company, a non-resident publisher, by means of the Louisiana long-arm statute is constitutionally permissible. The district court, in denying appellant's motion to dismiss, held that jurisdiction was properly acquired and did not violate constitutional requirements. We affirm.

Appellee Golino brought this action for libel against Curtis Publishing Company in the United States District Court for the Eastern District of Louisiana to recover damages allegedly resulting from an article in the February 29, 1964, issue of the Saturday Evening Post entitled: "New Orleans: Cosa Nostra's Wall Street—Crime in America: VI." In response, Curtis submitted a Motion to Dismiss, claiming that service upon it

under Louisiana's "long arm" statute[1] violated the due process clause, the commerce clause, and the first amendment. By affidavit in support of this motion, Curtis stated that:

[it] is a Pennsylvania corporation which is not licensed to do business in Louisiana, has no office, place of business, officers, agents, employees, solicitors, reporters, correspondents or photographers in that state, has no agent for service of process in that state, is not listed in any telephone directory in that state, and has no bank account or other assets or property in that state.

The affidavit also declared that:

(1) The article in question was written by an independent writer under contract with Curtis and was actually written in Connecticut, although the writer visited New Orleans to gather information and background material.

(2) There are no employees of Curtis in Louisiana soliciting subscriptions from residents. Subscriptions result from applications sent to Curtis' offices in New York or Pennsylvania.

(3) An independent national distributor, not Curtis itself, sells all newsstand copies of the Saturday Evening Post in Louisiana.

(4) Curtis has no reporters or correspondents regularly assigned to Louisiana. Occasionally such persons will be sent to the state upon special assignments.

(5) Curtis has no advertising solicitors regularly assigned to Louisiana, although occasionally a solicitor will visit the state.

(6) For the three years 1962–64, the average percentages of Curtis' business (Saturday Evening Post *only*) emanating from Louisiana was:

| | |
|---|---|
| Subscription circulation | .99% |
| Subscription revenue | .91% |
| Newsstand circulation | .87% |
| Newsstand revenue | .86% |
| Advertising pages | .09% |
| Newsstand circulation | 5,000–6,000 copies |
| Subscription circulation | 54,000–55,000 copies |

The record does not include any statistics concerning the circulation in Louisiana of defendant's other publications, Ladies Home Journal, Holiday, Jack and Jill, and the American Home.

On May 21, 1964, a hearing was held on defendant's motion to dismiss. The district court denied the motion, Golino v. Curtis Publishing Co., E.D.La.1965, 248 F.Supp. 576, but by its judgment certified an interlocutory appeal pursuant to Rule 54(b), Fed.R.Civ.P.

■ A determination of when a non-resident publisher may properly be brought into the courts of a state involves, as do all due process examinations, the resolution of a broad question of policy. What "minimum contacts" with a state will render such a publisher amenable to service of process is dependent to a large degree upon the equities of the situation. The ultimate goal is that justice prevail, and the courts' concept of what constitutes minimum contacts will be molded to meet

---

1. Curtis was served through the Secretary of State for the State of Louisiana pursuant to the provisions of La.Rev.Stat. Ann. § 13:3471(1) (Cum.Supp.1966), which provides:

   If the foreign corporation is not one required by law to appoint an agent for the service of process but has engaged in a business activity in this state, service of process in an action or proceeding on a cause of action resulting from such business activity in this state

   * * * may be made on any employee or agent of the corporation of suitable age or discretion found in the state. If such employees or agents are no longer in the state, or cannot be found after diligent effort, the officer charged with the duty of making the service shall make his return to the court * * *. Thereupon, the court shall order that service be made on the secretary of state.

the needs of justice.[2] A clear enunciation of this policy has been adopted by the Supreme Court as the "standard" by which assertions of jurisdiction over non-resident corporations must be measured:

> [D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 101.[3] When this broad policy is applied to specific facts, decisions are rendered which guide future tribunals in deciding similar questions as they arise. In applying these precedents, however, the judge and the attorney must always keep in mind the basis of the prior decisions—a desire to effectuate the underlying constitutional policy. It is always this underlying policy which must control the application of precedent, just as it must guide the creation of future precedent. Approaching our present case in this spirit, we are convinced that "notions of fair play and substantial justice" require rather than foreclose the decision reached by the district court.[4] The decisions of this Court cited by appellant as requiring a contrary result clearly do not do so when interpreted and applied in light of the underlying constitutional policy which they were written to effectuate.

Appellant places primary reliance upon Buckley v. New York Times Co., 5th Cir. 1964, 338 F.2d 470, and New York Times Co. v. Connor, 5th Cir. 1966, 365 F.2d 567. Both cases involved libel actions against The New York Times—one by Buckley, a Louisiana citizen, and the other by Connor, a citizen of Alabama.[5] The contacts of The Times with Louisiana were enumerated by the Court in *Buckley* as follows:

> The New York Times Company [sic] is edited and published in New York and is sent directly to subscribers and independent distributors from

---

2. This is not to say, of course, that a balancing of relative inconvenience to the parties is the sole inquiry required by the due process clause. The Supreme Court cautioned against such a view in Hanson v. Denckla, 1958, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, when it stated:

   [due process] restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States.

   \* \* \*

   [They require] in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.
   Id. at 251, 253, 78 S.Ct. at 1238, 1240, 2 L.Ed.2d at 1296, 1298.

3. See also Hanson v. Denckla, supra note 2; McGee v. International Life Ins. Co., 1957, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed. 2d 223. A thorough and well-reasoned discussion of the general issue here under consideration is Comment, Long-Arm Jurisdiction Over Publishers: To Chill a Mocking Word, 67 Colum.L.Rev. 342 (1967).

4. The question before the Court is of constitutional dimension since the Louisiana courts have interpreted their long-arm statute as authorizing service of process to the constitutionally permissible limits. Fidelity Credit Co. v. Bradford, La.Ct. App.1965, 177 So.2d 635, 637, writ ref'd, 179 So.2d 273; Babineaux v. Southeastern Drilling Corp., La.Ct.App.1965, 170 So.2d 518, 523–524, writ ref'd, 172 So.2d 700. See also Buckley v. New York Times Co., 5th Cir. 1964, 338 F.2d 470. The Federal Rules permit service of process upon foreign corporations in federal court "in the manner prescribed by the law of the state in which the district court is held \* \* \*." Fed.R.Civ.P. 4(d)(7) and 4(e), 28 U.S.C.

5. In *Buckley*, libel actions were filed against seven out-of-state publishers. Of the seven, the New York Times Company had the most significant contacts with Louisiana. Thus, from a precedential standpoint, the amenability of The Times to service of process under the Louisiana long-arm statute was the important issue in the case.

New York. The Times Company has no office or resident agents or employees in Louisiana of any kind. The only connections of the Times Company with Louisiana are: the sending of less than a thousandth of one per cent, in the aggregate, of its newspapers from New York to subscribers and to independent distributors in Louisiana; the occasional solicitation of advertising (an amount less than one thousandth of one per cent, in the aggregate) by traveling representatives; two trips were made in 1960, three in 1961 and four in 1962; and the occasional sending of staff reporters to Louisiana on special assignment (there are no regular Times reporters in Louisiana); this occurred eight times in 1960, twice in 1961 and eleven times in 1962.

338 F.2d at 473–474. As the *Connor* court pointed out, the contacts in the case before it were "virtually identical" with those listed in *Buckley*.[6] New York Times v. Connor, supra, 365 F.2d at 570. Both courts held that, on the facts before them, the respective state long-arm statutes could not constitutionally be applied to the Times. The *Buckley* court, in reaching this conclusion, stated:

> The law is well settled that the mere circulation of a periodical through the mails to subscribers and independent distributors constitutes neither doing business nor engaging in a business activity.

338 F.2d at 474. This language was cited, and *Buckley* held controlling, by

the Court in *Connor*, 365 F.2d at 570. It is upon this language that appellant most strongly relies. We are convinced, however, that such reliance is misplaced, as valid factual distinctions in the instant case require a different legal result. These distinctions are predicated upon basic differences between the business activities, purposes, and motivations of a publisher of a newspaper, albeit one of world-wide influence, and a publisher of national magazines.

The existence of a newspaper, no matter how popular, depends primarily upon circulation in the vicinity of its publication. Circulation in other areas may well be welcomed, but it is not critical to the newspaper's continued existence. Circulation beyond the vicinity of publication can be characterized as "passive" in that it is a product of the publication's excellence rather than of a business effort of active solicitation in all areas of the nation.[7] Such is not the case with a publisher of a national magazine. The primary function of such a business is to sell as many magazines as possible in every state of the union, and to that end the corporation actively directs its business.[8] The publication itself, unlike a newspaper, is not prepared primarily for local consumption, but rather for a nationwide audience. Curtis would certainly not argue that the Saturday Evening Post is published for the consumption of readers in Pennsylvania, its place of publication, more than for those in Oregon, Illinois, or Louisiana.

■■ Any resolution of the issue before us must take into account these

---

6. At least one factual idfference should be noted. The alleged libelous article complained of in *Buckley*, was acquired by the Times from an Associated Press dispatch, whereas that in *Connor* was written by a Times reporter who visited Alabama to gather information for the story. The Court in *Connor*, felt, however, that "this factor [did] * * * not serve as a basis for distinguishing the two cases." 365 F.2d at 570.

7. It may aid an understanding of the distinction here made to refer to circula-

tion in the general area of publication as "primary circulation" and to circulation beyond this area as "secondary circulation." Clearly the analysis of the issue before this Court would involve differing factors depending upon the location of the forum state in either the primary or secondary zone of circulation and business activity.

8. In the case of a magazine such as the Post, the entire nation could be viewed as the area of "primary circulation." Supra note 7.

basic differences between the businesses of publishing a newspaper and a national magazine; and precedent dealing with one type of business should not control cases involving the other unless it can be shown that such an application supports the underlying constitutional policy. Thus, the language of *Buckley* relied upon by appellants must be viewed in its factual context and applied with the above admonitions in mind. Ignoring these considerations, appellant argues that the statement of the *Buckley* court quoted above stands for the proposition that circulation alone may *never* give rise to contacts sufficient to satisfy the due process requirement. The logical defect in this interpretation can, however, be readily demonstrated. Under appellant's reading of *Buckley*, a national publisher would be allowed to insulate itself against suit in every state of the union except the state of publication. It could carry on all solicitation by mail or through independent distributors. The subject matter for its publications could be procured entirely through independent sources. By a proper degree of care, the publisher could eliminate nearly all physical contacts, other than circulation and correspondence, with all but one state. No doubt such a course would be motivated primarily by a desire to avoid legal actions brought in the other states where the publications were circulated. Clearly it would not comport with notions of fair play and substantial justice to allow a business enterprise, whose overriding business purpose is maximum exploitation of the national market, to be free from suit as a matter of law in all states but that of publication simply because physical contacts with the other states had been reduced to a minimum. The legal principle urged upon us by appellants would allow a publisher, fully aware of the strong possibility of resulting legal action, to print libelous matters directed at persons in distant localities, yet remain free from suit in such localities in spite of the pecuniary benefits gained in that very jurisdiction where it asserts it cannot be held legally accountable. A rule of law allowing such a condition would clearly not conform to the purposes behind the "minimum contacts" due process requirement. Resolution of the due process issue in the field of extra-territorial jurisdiction involves consideration of many factors. Circulation is admittedly one of these factors when dealing with a national publisher, and we are unwilling to say with appellant that it can never be sufficient in itself to satisfy the constitutional test.[9]

Looking to the facts, it is clear that the circulation of appellant's magazines in Louisiana is indeed substantial. Louisiana in 1964 accounted for approximately 1.5% of the total United States population.[10] Distribution figures for national publications such as the Post can be expected to conform closely to the national population distribution with at least two self-evident variables—(1) the presence of sales outside of the United States will tend to lower each state's percentage of total circulation, and (2) percentages of sales can be expected to slightly exceed population figures in areas of relative economic affluence and lag behind in poorer sections. In light of the above, it can hardly be doubted but that Curtis considered the nearly 1% circulation in Louisiana to be a significant portion of its business—as much as could be reasonably anticipated from the Louisiana market. Circulation is the heart of the magazine publication business. It is to the end of increasing circulation that all other facets of the business are directed.

9. Although this discussion is couched in terms of circulation being the only contact, as a practical matter other contacts amounting to actual physical presence can hardly be completely avoided by a publisher. Such is the case in the instant controversy. Reporters, advertising solicitors, and other employees and agents of Curtis intermittently visit Louisiana on business.

10. Golino v. Curtis Publishing Co., supra, 248 F.Supp. 576, at 579.

It is also the activity from which the alleged injuries in a libel action flow. Where, as here, the solicited circulation[11] of a corporation's publications account for a relatively significant portion of the corporation's revenue, notions of fair play and substantial justice support the right of the state to require the corporation to answer non-frivolous claims arising out of its contacts with the state, even though it has managed to reduce its physical presence in the state to a minimum.

Appellant also contends that first amendment considerations discussed in *Connor* compel reversal in the present case. We disagree. Certainly the language in *Connor* does not stand for the proposition that, because of the constitutional protection of the dissemination of ideas, a publisher may never be sued for libel in a state other than that of publication. Rather, *Connor* indicates that first amendment considerations are a factor relevant to a determination of the jurisdictional question;[12] and, the discussion of that factor in *Connor* must be viewed in its factual context. As discussed at length above, there are significant differences between the business of publishing a newspaper and a national magazine, especially as to what degree the policies and activities of that business are influenced by circulation in areas far removed from the place of publication. When dealing with a newspaper, it is reasonable to assume that,

due to the lack of substantial revenues derived from sales in distant forums, a strong possibility of lawsuits will have a chilling effect upon the desire of the paper to promote the distribution of publications expressing views unpopular in such forums. The same statement cannot be made concerning the business of a well-known, highly successful national magazine such as the Post. To argue that periodic lawsuits resulting from circulation of the Post will chill the desire of Curtis to actively encourage the widest possible circulation is clearly out of line with economic realities.

We have taken into account the first amendment considerations as one factor in reaching our decision. We do not, however, consider them controlling on the facts of this case. We are convinced that suits such as the present one, unless assumed to occur in unrealistically large numbers, will in no way inhibit the zeal with which Curtis distributes its ideas.[13]

The other case upon which appellant places strong reliance involved another allegedly libelous article in The Saturday Evening Post. Curtis Publishing Co. v. Birdsong, 5th Cir. 1966, 360 F.2d 344. The *Birdsong* controversy arose out of the events surrounding the admission of James Meredith to the University of Mississippi. The article complained of purportedly libeled members of the Mississippi Highway Patrol, who brought suit in the federal district court

---

11. We view as untenable, appellant's position that it does not actively solicit subscriptions from citizens of Louisiana.

12. This position has been subjected to criticism. Buckley v. New York Post Corporation, 2nd Cir. 1967, 373 F.2d 175, 182–184; Origoni v. Bulletin Co., D.D.C. 1966, 258 F.Supp. 359, 361; 67 Colum.L. Rev. 342, 355–364 (1967). See also Note, 52 Iowa L.Rev. 1034, 1041 (1967).

13. *Connor* and the instant case should not be read as drawing a clear, unwavering line between newspapers and national magazines. *Connor* does not categorically protect all newspapers whenever or wherever sued outside of the state of publication. Nor does the instant case require that like weight be given the first amendment considerations whenever a magazine publisher is the defendant. There are certainly situations in which the first amendment factor could be decisive or inconsequential, regardless of which type of publisher is involved. Clearly, the small magazine publisher who does not seek a nation-wide audience but who is sued on the basis of the inevitable but unintentional circulation in distant states will present an entirely different controversy for solution by the courts. As in the instant case, final resolution will depend upon the weighing of many factors, including those touching upon first amendment protection as they relate to a determination of the fundamental fairness of any given forum's assertion of jurisdiction.

in Alabama.[14] Substituted service of process was made on Curtis under the Alabama long-arm statute. Curtis moved to quash the complaint, asserting lack of personal jurisdiction. This motion was denied by the district court, but on appeal this Court reversed. Contrary to appellant's assertion, the action of this Court in *Birdsong* was not predicated in any way upon a finding that Curtis did not have contacts with Alabama sufficient to justify imposition of jurisdiction.[15] Rather, the finding of no jurisdiction was dictated by the forum state's lack of interest in the subject matter of the litigation.[16] Since the plaintiffs were not citizens of Alabama and the events giving rise to the allegedly libelous article occurred elsewhere, the court felt that an assertion of jurisdiction by an Alabama court would violate the due process clause of the fourteenth amendment. Clearly, the rationale of *Buckley* does not preclude a finding of jurisdiction in the instant case since the very elements of possible state interest found lacking by the Court in *Birdsong* are present in the case at bar.

Even on the issue of minimum contacts, *Birdsong* is detrimental to appellant's position. Judge Rives, in a concurring opinion, addressed himself to this issue. In doing so, he reviewed and applied the constitutional standard to Curtis' business activities in Alabama:

[T]he teachings as to nonresident jurisdiction reveal several key principles. It is "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws." Hanson v.

Denckla, supra, 357 U.S. at 253, 78 S. Ct. 1228, at 1240, 2 L.Ed.2d 1283. In the instant case, I think this part of the formula is clearly fulfilled. Post circulates over 60,000 copies per issue in Alabama out of the 6,500,000 copies published, or about .008% [sic] of its total circulation. In addition, over 4,000 copies are sold off newsstands. On occasions Post solicits advertising in Alabama. I submit that Post has actively submitted itself to the benefits of Alabama's fruitful market place just as much as did International Life with its single contract of insurance in the McGee case. Having accepted the benefits of the market place, it cannot complain that one of the fruits of the harvest was a lawsuit.

360 F.2d at 352–353. The circulation of the Post in Louisiana is virtually identical to that discussed above. Since the requisite state interest is also present, it is reasonable to assume that, presented with the facts of our case, the *Birdsong* court would hold as we do.

Perhaps an undue amount of space has been devoted in this opinion to the rather negative task of demonstrating why prior decisions of this Court do not require the result urged by Curtis. The analysis made and the resulting distinctions drawn in dealing with *Buckley, Connor,* and *Birdsong,* however, amply set forth the positive reasons for our decision. The business activity of Curtis in Louisiana is calculated, ordered, and substantial. The fact that physical contacts are minimized through the use of independent contractors and distributors does not alter the basic existence of Curtis' involvement in, and its pecuniary benefit from, a full exploitation of the Louisiana mar-

14. Suit was brought in Alabama rather than Mississippi in order to take advantage of that state's more liberal long-arm statute.

15. The majority expressly declined to resolve the issue of whether ·Curtis had constitutionally sufficient "minimum contacts" with Alabama. 360 F.2d at 346.

16. The *Birdsong* court's use of a state interest analysis in the resolution of the

jurisdictional question is unique in the sense that such an approach had never before been clearly articulated. Nevertheless, consideration of the interest of the forum state has probably influenced the decisions in many prior cases. See e.g., McGee v. International Life Ins. Co., supra, note 3 at 223, 78 S.Ct. at 201, 2 L.Ed.2d at 226: Note, 45 Texas L.Rev. 188 (1967).

ket;[17] nor does it remove Curtis' reliance upon the protection of Louisiana's laws.[18] Curtis can reasonably anticipate that the sale, distribution, and promotion of its publications might entail libel actions, and that such actions will in all probability be brought at the places of residence of parties alleging injury. Considering these factors, the requirement of defense in Louisiana in the instant case should not be viewed as a significant inconvenience to Curtis. It is certainly not one that will hinder the flow of Curtis' publications into the state.

Viewing the issue from the plaintiff's standpoint, the inconvenience of a contrary result would be far from nominal. In all probability it would be prohibitive. The operative facts upon which the merits of plaintiff's claim must eventually turn occurred in Louisiana; and, no doubt, most if not all of the witnesses which will be called to testify at trial are citizens of Louisiana. Thus, the issues raised by plaintiff's allegations can best be resolved in Louisiana rather than in New York or Pennsylvania.[19]

■ Having considered all of the above factors, we are convinced that the assertion of jurisdiction over Curtis under the Louisiana long-arm statute is constitutionally permissible. Therefore, the judgment of the lower court denying appellant's motion to dismiss is affirmed.[20]

## ON PETITION FOR REHEARING EN BANC

### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25a, subpar. (b), the Petition for Rehearing En Banc is denied.

---

17. The record in the present case states, "[a]ll copies of the Post destined for newsstand sale are sold and delivered by the Company in Pennsylvania to a national distributor which handles the magazines of several different publishers." The identity of this national distributor is not revealed by the record. Were it not for this omission, another significant contact of Curtis with Louisiana would, in all probability, be revealed. In Curtis Publishing Co. v. Cassel, 10th Cir. 1962, 302 F.2d 132, a Kansas resident brought a libel action against Curtis. The tenth circuit held the defendant amenable to suit in Kansas. In *Cassel*, as here, Curtis asserted that distribution in the state was made by an independent national distributor. The record in that case, however, revealed the distributor to be Curtis Circulation Company, a wholly owned subsidiary of Curtis Publishing Company. The court, after consideration of the relationship between the two companies, considered Curtis Circulation to be an agent of Curtis Publishing for purposes of resolving the jurisdictional issue.

18. See Buckley v. New York Post Corp., 2nd Cir. 1967, 373 F.2d 175; Curtis Publishing Co. v. Birdsong, 5th Cir. 1966, 360 F.2d 344, 348 (Rives, J., concurring); Curtis Publishing Co. v. Cassel, supra, note 17; Sonnier v. Times Inc., W.D.La.1959, 172 F.Supp. 576. See also Time, Inc. v. Manning, 5th Cir. 1966, 366 F.2d 690.

19. Buckley v. New York Post Corp., supra, note 18:
    [W]hen the operative facts have occurred where the plaintiff sues, the convenience of both parties would often be served by a trial there, and the chief benefit to the defendant of a rule requiring the plaintiff to seek him out is the impediment this creates to the bringing of any suit at all.
    Id. at 181.

20. Although not discussed by us, appellant's commerce clause argument has been considered and found to be unpersuasive.