Eugene Sinclair **DAVID**, Jr., Plaintiff,

v.

The **NATIONAL LAMPOON, INC.**, Defendant.

Civ. A. No. 76–232.

United States District Court,
D. South Carolina,
Columbia Division.

Jan. 21, 1977.

James Keven Holmes, Francis T. Draine, Lourie, Draine & Curlee, Columbia, S.C., for plaintiff.

James M. Brailsford, III, Robinson, McFadden, Moore & Pope, Columbia, S.C., for defendant.

## ORDER ON DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

HEMPHILL, District Judge.

This action is before the court on defendant's motion to dismiss for a lack of personal jurisdiction. The defendant is a satirical magazine which distributes its monthly publication nationally. One of the basic types of humor exhibited by the defendant magazine is its parodies of other national magazines. In September, 1973, the defendant published a parody of a wartime issue of "Life" magazine which contained a picture of the plaintiff accompanied by a caption which, although possibly humorous to some, was apparently offensive and embarrassing to the plaintiff. This picture, with accompanying caption, also appeared in a subsequent publication known as "Best

of Lampoon, No. 5", which was a special issue consisting of a collection of the more popular articles that had appeared in the defendant's regular monthly publication. Consequently, the plaintiff sued for invasion of privacy. The defendant now argues that their contacts with the State of South Carolina are sufficiently lacking in quantity and quality so that the assumption of jurisdiction in this case, pursuant to Rule 4, Federal Rules of Procedure, would offend the "traditional notions of fair play and substantial justice" outlined in the case of *International Shoe Co. v. Washington*[1] and its progeny.

The relevant jurisdictional facts are as follows. The defendant is a New York corporation with its principal place of business in New York, and has no offices, telephone or business directory listings, registered agents, bank accounts, real or personal property, corporate books or records, employees or agents in the State of South Carolina. It is not authorized or registered to do business in South Carolina. The defendant's magazines are edited and published in New York and printed in Kansas. The defendant sells its product to an independent, unaffiliated national distributor for wholesale distribution.

National Lampoon, Inc., has the following contacts with the State of South Carolina. In 1974–1976 an average of 4,226 magazines were sold per month in South Carolina with an average monthly subscription rate of 818. There were an estimated 2600 copies of "special" issues, or collections of the best articles from other issues sold in South Carolina for the same period. The Lampoon's revenues from sales in the State of South Carolina during the year 1975–76 amount to .6 of 1% of total revenues. The percentage of revenues from the September, 1973 issue was also .6 of 1%. South Carolina revenues from the "Best of Lampoon, No. 5" equalled approximately .85 of 1% of total sales from that issue. Although the defendants maintain that they received no advertising revenue from South Caroli-

1. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

na, they admit that they submit data on their South Carolina distribution to perspective advertisers, no doubt in an effort to attract their patronage. The defendant also actively solicits subscriptions and the retail distributors for their publications in South Carolina. The defendant admittedly distributed, into the State of South Carolina, an estimated 4,000 to 6,000 copies of the publication which allegedly resulted in harm to the plaintiff.

In determining whether or not this court may exercise personal jurisdiction over a foreign corporation, it must first determine if such jurisdiction exists under the "long arm" statutes [2] of South Carolina and then move to the question of whether the exercise of such jurisdiction would be violative of due process.

■ This court finds, as it has in the past, that "these statutes were intended to afford and do afford the courts of South Carolina the full reach of jurisdiction permitted by the due process clause of the United States Constitution." *Duplan Corp. v. Deering Milliken, Inc.*, D.C., 334 F.Supp. 703 (1971); citing *Shealy v. Challenger Mfg. Co.*, 304 F.2d 102, 107 (4th Cir. 1962); *Textured Fibres, Inc. v. Deering Milliken Research Corp.*, D.C., 302 F.Supp. 487 (1969). The due process limitations on state court jurisdiction were initially formulated by the Supreme Court in the landmark decision of *International Shoe Co. v. Washington, supra.* In that case the court held that due process of law as guaranteed in the United States Constitution requires that a foreign corporation have certain "minimum contacts" with a forum state so that the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice". In discussing the required analytical process, the court said:

> It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. . . . Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of laws which it was the purpose of the due process clause to insure. 326 U.S. at 319, 66 S.Ct. at 159.

■ In *Hardy v. Pioneer Parachute Co., Inc.*, 531 F.2d 193 (4th Cir. 1976), the Fourth Circuit, in applying the doctrine of *International Shoe*, stated that "a single transaction is sufficient contact to satisfy the standard if it gives rise to the liability asserted in the suit . . . No unconstitutional burden is imposed on a foreign corporation by requiring it to defend a suit in a forum located in a state where it has advertised and sold the product whose use gave rise to the cause of action." (Citations omitted). 531 F.2d at 195. That case involved a products liability action and the defendant argues that the jurisdiction rulings in products liability cases are inapplicable to the

2. The relevant "long arm" provision is Section 10.2–803 of the South Carolina Code which reads as follows:

(1) A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's

(a) transacting any business in this State;

(b) contracting to supply services or things in the State;

(c) commission of a tortious act in whole or in part in this State;

(d) causing tortious injury or death in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this State; or

(e) having an interest in, using, or possessing real property in this State; or

(f) contracting to insure any person, property or risk located within this State at the time of contracting; or

(g) entry into a contract to be performed in whole or in part by either party in this State; or

(h) production, manufacture, or distribution of goods with the reasonable expectation that those goods are to be used or consumed in this State and are so used or consumed.

(2) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him, and such action, if brought in this State, shall not be subject to the provisions of § 10–310(3).

present case. This distinction appears to be an artificial one. This court can see no real legal distinction between a publisher who causes a publication which allegedly harmed the plaintiff to be distributed in the state and a manufacturer who ships an allegedly defective product into the state. In both cases, a foreign corporation is knowingly selling its wares within the State of South Carolina and should reasonably be expected to travel there to defend suits brought by citizens who have allegedly been harmed by their revenue producing activities.

■ It is argued by the defendant that its status as a publisher entitles it to a higher jurisdictional standard due to the First Amendment considerations outlined in *New York Times v. Connor*, 365 F.2d 567 (5th Cir. 1966). This position has been widely criticized and disregarded; *see, Buckley v. New York Post*, 373 F.2d 175 (2d Cir. 1967), *"Long Arm Jurisdiction Over Publishers: To Chill A Mocking Word"*, 67 Colum.L.Rev. 343 (1967); Constitutional Limitations *To Long Arm Jurisdiction in Newspaper Libel Cases*, 34 U.Chi.L.Rev. 436 (1967), and appears now to have been discarded by the Fifth Circuit itself. *Curtis Publishing Co. v. Golino*, 383 F.2d 586 (5th Cir. 1967). It is the opinion of this court that the defendant's First Amendment rights will receive ample protection when the merits of the case are reached and consideration of them at the jurisdictional stage will only serve to cloud the valid issues.

■ The defendant in this case actively attempts to develop a national market and readership. The defendant is also aware that each month large numbers of its magazines are distributed in South Carolina. Although it does not advertise for any South Carolina concerns, it admittedly uses its South Carolina circulation figures to, in some degree, attract other advertisers to their magazine. They maintain that only a very small percentage of their revenues are derived from the sales of their magazines in South Carolina. It would seem quite logi-

cal that the reason that South Carolina accounts for such a small percentage of their total sales revenue is that South Carolina is a relatively small state.[3] Apparently, this amount of revenue is just as substantial proportionately as a tremendously larger percentage of revenue or circulation would be from a state such as California. A distribution of 4,226 magazines per month in addition to "special" issues is in and of itself a quite substantial contact with the State of South Carolina.

■ As the Fourth Circuit said in the *Pioneer Parachute* case:

> Modern transportation, communication, and the national flow of commerce have contributed to the recognition that states have a legitimate interest in providing means for their citizens to seek redress against foreign corporations that ship allegedly defective products into the state. 531 F.2d at 195.

This principle is equally applicable whether the alleged potential for harm is latently concealed in a household appliance, a can of food or a printed page. All are different types of products capable of producing different types of harm, but all are identical for purposes of jurisdictional analysis. For this reason, given the defendant's ongoing, purposeful contacts with the State of South Carolina and the fact that the alleged cause of action arose directly from said contacts, it would be imminently unfair to allow the defendants to avoid jurisdiction in this state.

Therefore, the defendant's motion is *denied*.

AND IT IS SO ORDERED.

---

**3.** The United States Census Bureau figures for 1976 reveal that the population of South Carolina is approximately 2,848,000 as opposed to 214,659,000 for the entire United States.