Opinion
 

 JENKINS, J.
 
 *
 

 Orders to quash service of process against out-of-state newspapers, who claim a special preference under the First Amendment, are appealed. Analogizing to Gertrude Stein (a rose is a rose is a rose), and agreeing with Chief Justice Burger, concurring in
 
 First National Bank of Boston
 
 v.
 
 Bellotti
 
 (1978) 435 U.S. 765, 796-802 [55 L.Ed.2d 707, 730-734, 98 S.Ct. 1407, 1426-1429], that free speech is free speech, we conclude that no such special privilege for the press exists in California in the context here asserted. However, using usual rules applicable equally to all, we find insufficient contacts for in personam jurisdiction, and affirm the court below.
 

 Facts
 

 On September 22, 1975, an attempt was made on the life of then President Gerald R. Ford by Sarah Jane Moore, since apprehended, convicted, and now serving her sentence. That attempt was frustrated, at least in part, by Oliver Sipple (appellant), identified that date by national media as a disabled ex-Marine, who became somewhat of an instant “hero.”
 

 Two days later, Herb Caen, a nationally known columnist, published in his column in the San Francisco Chronicle an account which implied that Sipple was a homosexual. On September 25, 1975, the Los Angeles Times and respondents, various out-of-state newspapers who purchased the accounts from the Times news service, published articles more explicitly
 
 *147
 
 stating appellant was of that sexual preference. Immediately thereafter, Sipple together with his lawyer and minister, called a press conference and alleged a breakdown of family relationships as a result of publicity. That day, a lawsuit for $5 million was filed against respondents and the in-California newspapers, for invasion of privacy for publishing the fact of Sipple’s homosexuality, a fact not denied.
 
 [1]
 

 The jurisdictional facts are clear and uncontroverted. None of the corporate defendants is a California corporation, is qualified to do business or publishes a paper here. None solicits subscriptions in this state. Each has some circulation, none more than 0.3 percent in California. None derives more than 3 percent of its advertising revenues here.
 

 As for the individual publisher defendants, none had any contacts with California nor owned property here except Dorothy Shiff of the New York Post, who has land in Fresno. None had prior knowledge of the questioned article.
 

 This jurisdictional posture gives rise to a constitutional issue of first impression in California:
 

 (a) Do newspapers enjoy a special preference under the First Amendment in deciding in personam jurisdiction questions dealing with publication of allegedly tortious material?
 

 If the answer is “no,” then three questions arise:
 

 (b) Is there statutory authority for such jurisdiction?
 

 (c) Were the contacts here, under usual rules, sufficient for jurisdiction?
 

 (d) Does balancing of equities (one small plaintiff versus several large newspaper defendants) require imposition of the long-arm jurisdiction statute?
 

 
 *148
 
 Discussion
 

 I.
 

 Respondents declaim vigorously that “First Amendment considerations, and the strong public policy to protect freedom of speech and the press in California, must be considered in determining whether jurisdiction should be asserted . . . .” Acknowledging no appellate decision in this state has come to grips with the issue, they rely strongly on
 
 New York Times Company
 
 v.
 
 Connor
 
 (5th Cir. 1966) 365 F.2d 567 and its progeny. There, Police Commissioner Eugene “Bull” Connor of Birmingham, of Alabama racial tension fame in the 1960’s, was denied recovery for an allegedly libelous newspaper article, the court commenting (at p. 572): “First Amendment considerations surrounding the law of libel require a greater showing of contact to satisfy the due process clause than is necessary in asserting jurisdiction over other types of tortious activity.”
 

 Respondents, using a favorite phrase of the media when any restriction on them is intimated, emphasize the “chilling effect on exercise of freedom of the press” if that principle is not extended to actions for invasion of privacy. This is an area which the courts have carefully skirted, but into which legal scholars love to leap. Some (Nimmer,
 
 The Right to Speak
 
 (1968) 56 Cal.L.Rev. 935) analyze the concept and cases, by suggesting a “definitional” rather than “ad hoc” balancing of competing interests (e.g., right to know versus national security). Thus in a privacy case, one starts with Dean Prosser’s categorization of “public disclosure of embarrassing facts about the plaintiff’ (Prosser, Law of Torts (4th ed. 1971) § 117, pp. 802-818) and finds that if a statement is not false, reputation-injuring or defamatory, inquiry must be made as to whether the interest in privacy is outweighed by newsworthiness.
 

 Other scholars take a different approach, suggesting, as respondents seem to here, that a special privilege or preference is given to the media by attaching a broader meaning to “freedom of the press” than “freedom of speech.” However, an exposition by several authors from Potter Stewart to William Douglas in 26 Hastings L.J. (1975) discussing that position, is introduced with the acknowledgment (at p. 640) that the “foremost historian of the First Amendment [Levy, Legacy of Suppression—Freedom of Speech and Press in Early American History (1963)] tells us that prior to and contemporaneous with its adoption
 
 *149
 
 ‘[m]ost writers, including Addison, Cato, and Alexander, who employed the term “freedom of speech” with great frequency used it synonymously with freedom of the press.’ ” And the Supreme Court in a similar context of press freedom stated that the proposition that the press may claim greater rights than the public generally “finds no support in the words of the Constitution or in any decision of this Court.” (See
 
 Pell
 
 v.
 
 Procunier
 
 (1974) 417 U.S. 817, 834-835 [41 L.Ed.2d 495, 509, 94 S.Ct. 2800]; 26 Hastings L.J. 642.)
 

 Most recently, the subject is discussed (noting it is only indirectly implicated in the case) by Mr. Chief Justice Burger, in
 
 First National Bank of Boston
 
 v.
 
 Bellotti, supra,
 
 435 U.S. at pp. 796-802 [55 L.Ed.2d at pp. 730-734, 98 S.Ct. at pp. 1426-1429], Talking about “those who view the Press Clause as somehow conferring special and extraordinary privileges or status on the ‘institutional press’ ” (at p. 797 [55 L.Ed.2d at p. 731, 98 S.Ct. at p. 1427]), Burger reviews lack of support for that concept by framers of the Constitution, and finds it would be reminiscent of the “abhorred licensing system of Tudor and Stuart England—a system the First Amendment was intended to ban from this country” (at p. 801 [55 L.Ed.2d at p. 733, 98 S.Ct. at p. 1429]). He concludes with a quotation from Justice Frankfurter, concurring in
 
 Pennekamp
 
 v.
 
 Florida
 
 (1946) 328 U.S. 331, 364 [90 L.Ed. 1295, 1313, 66 S.Ct. 1029]: “ ‘[T]he purpose of the Constitution was not to erect the press into a privileged institution but to protect all persons in their right to print what they will as well as to utter it. “. . . the liberty of the press is no greater and no less. . .” than the liberty of every citizen of the Republic.’ ” (at p. 802 [55 L.Ed.2d at p. 734, 98 S.Ct. at p. 1429]). In short, says Burger, “the First Amendment does not ‘belong’ to any definable category of persons or entities: it belongs to all who exercise its freedoms”
 
 (ibid.).
 

 The conclusion of the Chief Justice that the First Amendment fails to give special protection to the “institutional press” under a freedom of the press theory parallels the finding that it also fails to give special protection from jurisdiction to defendants whose tortious acts performed outxtf state arise from exercise of rights arguably protected by the First Amendment. Though the
 
 Connor
 
 decision, relied on by respondents, appears to give such protection, that decision “has been widely criticized and disregarded [citations], and appears now to have been discarded by the Fifth Circuit itself [citations].”
 
 (David
 
 v.
 
 National Lampoon, Inc.
 
 (D.S.C. 1977) 432 F.Supp. 1097, 1100; accord
 
 Anselmi
 
 v.
 
 Denver Post, Inc.
 
 (10th Cir. 1977) 552 F.2d 316, 324.)
 

 
 *150
 
 Fourteenth Amendment encapsulation of First Amendment rights into California adds no dimension to respondents’ posture. A free press is essential and basic to our system of government, our way of life. But if the press seeks to encase itself in special armor, it strongly invites special weapons or restraints to breach its links. This is a result mimical to the very idea of a “free” press, not supported by our Constitution, statutes, case law or our traditional concepts of American freedoms, and not followed by this court.
 

 II.
 

 Treating the newspapers here as they are entitled to be treated—equal to all others in their First Amendment rights—the usual inquiries must be made. First, is there statutory authority to assert jurisdiction over respondents in. invasion of privacy cases? That has been answered affirmatively by legislative enactment of Code of Civil Procedure, section 410.10: “A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.”
 

 One of the recognized bases for jurisdiction in California arises when the defendant has caused an effect in the state by an act or omission which occurs elsewhere. This ground for assertion of jurisdiction is discussed in the Judicial Council’s comment to section 410.10: “ ‘A state has power to exercise judicial jurisdiction over an individual who causes effects in the state by an omission or act done elsewhere with respect to causes of action arising from these effects,
 
 unless the nature of the effects and of the individual’s relationship to the state make the exercise of such jurisdiction unreasonable.
 
 [Citations.] When jurisdiction over an individual is based solely upon such act or omission, only a claim for relief arising from such act or omission may be asserted against the individual. [Citation.]’ (Italics added.)”
 
 (Sibley
 
 v.
 
 Superior Court
 
 (1976) 16 Cal.3d 442, 446 [128 Cal.Rptr. 34, 546 P.2d 322].)
 

 Appellant seeks to justify jurisdiction on the basis of the alleged acts of publishing the articles outside of California leading to a psychological effect upon appellant in this state. There is no California case on this subject. A federal court applying California law has found jurisdiction in a privacy case, following the cases involving the sending of defective products into the state.
 
 (Bibie
 
 v.
 
 T. D. Publishing Corporation
 
 (N.D.Cal. 1966) 252 F.Supp. 185, cited with approval in
 
 Buckeye Boiler Co.
 
 v.
 
 Superior Court
 
 (1969) 71 Cal.2d 893, 903 [80 Cal.Rptr. 113, 458 P.2d 57].) Other jurisdictions have recognized that an invasion of privacy
 
 *151
 
 by out-of-state publication may justify suit within the state of the plaintiff's residence if the contacts are sufficient. (See
 
 David
 
 v.
 
 National Lampoon, Inc., supra,
 
 432 F.Supp. 1097;
 
 Cordell
 
 v.
 
 Detective Publications, Inc.
 
 (E.D.Tenn. 1968) 307 F.Supp. 1212, affd. (6th Cir. 1969) 419 F.2d 989.) It is evident that such an act
 
 may
 
 form the basis for jurisdiction in California. (See 1 Witkin, Cal. Procedure (2d ed. 1971) Jurisdiction, § 94, pp. 618-619, and authorities cited therein.)
 

 III.
 

 As a general constitutional principle, a court may exercise personal jurisdiction over a nonresident individual so long as he has such minimal contacts with the state that the maintenance of the suit does not offend “ ‘traditional notions of fair play and substantial justice.’ ”
 
 (Internat. Shoe Co.
 
 v.
 
 Washington
 
 (1945) 326 U.S. 310, 316, 317 [90 L.Ed. 95, 101-103, 66 S.Ct. 154, 161 A.L.R. 1057].) Thus, even though the publishers here have no special First Amendment privilege, their contacts and relationship with the state must be examined.
 

 In analogous libel cases, the federal courts have determined jurisdiction on a factual basis, in terms of “doing business” or “contacts” within the state. If any general principles can be drawn from those decisions, they are that: (1) Since
 
 Connor,
 
 newspaper publishers will be subjected to jurisdiction in other jurisdictions under the following circumstances—(a) when there is significant circulation in a neighboring state economically and intellectually tied to the state of publication
 
 (Buckley
 
 v.
 
 New York Post Corporation
 
 (2d Cir. 1967) 373 F.2d 175)—(b) when the report of a newspaper or news service is directed specifically to readers in the forum state by dissemination to local newspapers
 
 (Edwards
 
 v.
 
 Associated Press
 
 (5th Cir. 1975) 512 F.2d 258;
 
 Rebozo
 
 v.
 
 Washington Post Company
 
 (5th Cir. 1975) 515 F.2d 1208)—(c) when the story has particular local appeal in the forum state such that it was foreseeable or even intended that it be given substantial attention in the forum state
 
 (Edwards,
 
 supra;
 
 Anselmi
 
 v.
 
 Denver Post, Inc., supra,
 
 552 F.2d 316); (2) magazine publishers seeking to reach a national audience will be subjected to jurisdiction in the state of plaintifFs residence if the circulation there is proportionate to population
 
 (Curtis Publishing Company
 
 v.
 
 Golino
 
 (5th Cir. 1967) 383 F.2d 586;
 
 David
 
 v.
 
 National Lampoon, Inc., supra,
 
 432 F.Supp. 1097).
 

 The facts of this case do not fall within any of the above categories in which long-arm jurisdiction is justified. All of the
 
 *152
 
 newspapers involved here are published in distant states, and none has significant circulation or other contacts with California. None sent reporters into this state to develop the story giving rise to the suit or published the article with the intention that it would be transmitted to California newspapers. The story was one of national importance, not expected to receive any greater attention in California. And it was published not in national magazines, but in local newspapers from other jurisdictions. Thus, here there was little more than publication of an article which would conceivably have a tortious effect in California. No case has authorized jurisdiction on so little.
 

 Our recent decision in
 
 McGuire
 
 v.
 
 Brightman
 
 (1978) 79 Cal.App.3d 776 [145 Cal.Rptr. 256], is distinguishable on its facts. We held there that jurisdiction by a South Dakota court over a San Francisco publication was proper. However, there the publication was not a local newspaper, but a national publication with 4.3 percent of its subscribers in South Dakota. Furthermore, the story was of particular local appeal in South Dakota and was written by a reporter who had gathered information for the story during a visit to the forum state. Those features made the
 
 McGuire
 
 case similar to
 
 Anselmi
 
 and
 
 Golino.
 
 Here, with such similarities absent, we find no basis for jurisdiction.
 

 This court also notes that the facts here are clearly distinguishable from the typical product case in which jurisdiction is asserted over a manufacturer sending a defective product into the state. (See, e.g.,
 
 Buckeye Boiler Co.
 
 v.
 
 Superior Court
 
 (1969) 71 Cal.2d 893, 902 [80 Cal.Rptr. 113, 458 P.2d 57].) “A manufacturer engages in economic activity within a state as a matter of ‘commercial actuality’ whenever the purchase or use of his product within the state generates gross income for the manufacturer and is not so fortuitous or unforeseeable as to negative the existence of an intent on the manufacturer’s part to bring about this result.”
 
 (Id.)
 
 In the case of newspaper distribution in a neighboring state (see
 
 Buckley
 
 v.
 
 New York Post, supra)
 
 or of distribution of a national magazine (see
 
 Curtis Publishing Company
 
 v.
 
 Golino, supra),
 
 the “commercial actuality” test for economic activity is easily met. However, where, as here, a local newspaper from a distant state has incidental distribution in California, the generation of income from the forum state is “so fortuitous or unforeseeable as to negative the existence of an intent ... to bring about” that result, and no jurisdiction attaches.
 

 
 *153
 
 IV.
 

 Finally, appellant contends that this court should engage in the process of balancing of the lawsuit. Such a balancing process was undertaken in
 
 Cornelison
 
 v.
 
 Chaney
 
 (1976) 16 Cal.3d 143, 151 [127 Cal.Rptr. 352, 545 P.2d 264], where the court weighed such factors as “the relative availability of evidence and the burden of defense and prosecution in one place rather than another; the interest of a state in providing a forum for its residents or regulating the business involved; the ease of access to an alternative forum; the avoidance of a multiplicity of suits and conflicting adjudications; and the extent to which the cause of action arose out of defendant’s local activities.” But where, as here, the defendants’ “contacts with California are insufficient to justify jurisdiction, it is not necessary to undertake the additional process of balancing the inconvenience of defending the action in this state against the interests of plaintiff in suing locally and of the state in assuming jurisdiction. [Citations.]”
 
 (Sibley
 
 v.
 
 Superior Court, supra,
 
 16 Cal.3d at p. 448.)
 

 Orders granting motions to quash are affirmed.
 

 Scott, Acting P. J., and Feinberg, J., concurred.
 

 Appellant’s petition for a hearing by the Supreme Court was denied August 24, 1978. Bird, C. J., was of the opinion that the petition should be granted.
 

 *
 

 Assigned by the Chairperson of the Judicial Council.
 

 [1]
 

 Obviously, appellant’s “privacy” is considerably invaded by the enshrining in hard cover of this published opinion, as it was by his calling a press conference. In neither case is a defendant reachable in California.