154 Cal.App.3d 1040 (1984)
201 Cal. Rptr. 665
OLIVER W. SIPPLE, Plaintiff and Appellant,
v.
CHRONICLE PUBLISHING COMPANY et al., Defendants and Respondents.
Docket No. AO11998.
Court of Appeals of California, First District, Division Four.
April 13, 1984.
*1043 COUNSEL
Bruce T.H. Burke, Burke & Kessler and John Eshleman Wahl for Plaintiff and Appellant.
Cooper, White & Cooper, Neil L. Shapiro, Carey F. Corbaley, Gibson, Dunn & Crutcher, Robert S. Warren, Rex S. Heinke and Gail E. Lees for Defendants and Respondents.
David M. Olive and McMillan & Spratling as Amici Curiae on behalf of Defendants and Respondents.
OPINION
CALDECOTT, P.J.
On September 22, 1975, Sara Jane Moore attempted to assassinate President Gerald R. Ford while the latter was visiting San Francisco, California. Plaintiff Oliver W. Sipple (hereafter appellant or Sipple) who was in the crowd at Union Square, San Francisco, grabbed or struck Moore's arm as the latter was about to fire the gun and shoot at the President. Although no one can be certain whether or not Sipple actually saved the President's life, the assassination attempt did not succeed and Sipple was considered a hero for his selfless action and was subject to significant publicity throughout the nation following the assassination attempt.
*1044 Among the many articles concerning the event was a column written by Herb Caen and published by the San Francisco Chronicle on September 24, 1975. The article read in part as follows: "One of the heroes of the day, Oliver `Bill' Sipple, the ex-Marine who grabbed Sara Jane Moore's arm just as her gun was fired and thereby may have saved the President's life, was the center of midnight attention at the Red Lantern, a Golden Gate Ave. bar he favors. The Rev. Ray Broshears, head of Helping Hands, and Gay Politico, Harvey Milk, who claim to be among Sipple's close friends, describe themselves as `proud  maybe this will help break the stereotype'. Sipple is among the workers in Milk's campaign for Supervisor."
Thereafter, the Los Angeles Times and numerous out-of-state newspapers published articles which, referring to the primary source (i.e., the story published in the San Francisco Chronicle), mentioned both the heroic act shown by Sipple and the fact that he was a prominent member of the San Francisco gay community. Some of those articles speculated that President Ford's failure to promptly thank Sipple for his heroic act was a result of Sipple's sexual orientation.[1]
Finding the articles offensive to his private life, on September 30, 1975, Sipple filed an action against the California defendants, the Chronicle Publishing Company, Charles de Young Thieriot, the publisher of the Chronicle, Herb Caen, a columnist for the Chronicle, the Times Mirror Company, the owner and publisher of the Los Angeles Times, and Otis Chandler (hereafter together respondents) and numerous out-of-state newspapers. The complaint was predicated upon the theory of invasion of privacy and alleged in essence that defendants without authorization and consent published private facts about plaintiff's life by disclosing that plaintiff was homosexual in his personal and private sexual orientation; that said publications were highly offensive to plaintiff inasmuch as his parents, brothers and sisters learned for the first time of his homosexual orientation; and that as a consequence of disclosure of private facts about his life plaintiff was abandoned *1045 by his family, exposed to contempt and ridicule causing him great mental anguish, embarrassment and humiliation. Plaintiff finally alleged that defendants' conduct amounted to malice and oppression calling for both compensatory and punitive damages.
The out-of-state defendants moved for quashing the service of process against them for lack of personal jurisdiction. The trial court granted the motion and its ruling was upheld on appeal in Sipple v. Des Moines Register & Tribune Co. (1978) 82 Cal. App.3d 143 [147 Cal. Rptr. 59]. The California defendants (respondents in this case) moved for summary judgment the first time on December 19, 1975, and February 17, 1976, respectively. On June 22, 1976, the trial court denied the motions. Thereafter, the parties conducted discovery proceedings which included the depositions of Sipple, Sentinel reporters Morris and Johns and Chronicle columnist Caen.
Based upon this newly acquired evidence, in February 1980 respondents renewed their motion for summary judgment claiming in essence that the information disclosed in the articles was already public; that the publication was newsworthy which provided immunity for invasion of privacy; and that the element of malice was likewise absent. The trial court granted the motions on April 22, 1980, and consistent therewith, on May 7, 1980, judgment was entered dismissing the action against respondents. The present appeal followed.
Appellant's principal contention on appeal is that the trial court prejudicially erred in granting summary judgment in favor of respondents. More precisely, appellant argues that the individual elements of the invasion of privacy (i.e., public disclosure of private facts; the offensiveness of the public disclosure; and the newsworthiness of the publication as an exception to tort liability) constituted a factual determination which could not be resolved or adjudicated by way of summary procedure.
Before discussing appellant's contentions on the merit, as an initial matter we set out the legal principles governing the case. (1) It is well settled that there are three elements of a cause of action predicated on tortious invasion of privacy. First, the disclosure of the private facts must be a public disclosure (Porten v. University of San Francisco (1976) 64 Cal. App.3d 825, 828 [134 Cal. Rptr. 839]). Second, the facts disclosed must be private facts, and not public ones (Kapellas v. Kofman (1969) 1 Cal.3d 20, 35 [81 Cal. Rptr. 360, 459 P.2d 912]; Coverstone v. Davies (1952) 38 Cal.2d 315, 323 [239 P.2d 876]). Third, the matter made public must be one which would be offensive and objectionable to a reasonable person of ordinary sensibilities (Forsher v. Bugliosi (1980) 26 Cal.3d 792, 808-809 [163 Cal. Rptr. 628, 608 P.2d 716]; Gill v. Hearst Publishing Co. (1953) *1046 40 Cal.2d 224 [253 P.2d 441]). (2) It is likewise recognized, however, that due to the supreme mandate of the constitutional protection of freedom of the press even a tortious invasion of one's privacy is exempt from liability if the publication of private facts is truthful and newsworthy. The latter proposition finds support primarily in Restatement Second of Torts section 652D which provides that "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public."
In interpreting the cited section, the cases and authorities emphasize that the privilege to publicize newsworthy matters incorporated in section 652D is not only immunity accorded by the common law, but also one of constitutional dimension based upon the First Amendment of the United States Constitution. As tersely stated in commented to section 652D: "When the subject-matter of the publicity is of legitimate public concern, there is no invasion of privacy. [¶] This has now become a rule not just of common law of torts, but of the Federal Constitution as well." (Accord Cox Broadcasting Corp. v. Cohn (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029]; Time, Inc. v. Hill (1967) 385 U.S. 374, 383 [17 L.Ed.2d 456, 464, 87 S.Ct. 534]; Virgil v. Time, Inc. (9th Cir.1975) 527 F.2d 1122, 1129; see also Forsher v. Bugliosi, supra, 26 Cal.3d at pp. 809-810; Briscoe v. Reader's Digest Association, Inc. (1971) 4 Cal.3d 529, 541 [93 Cal. Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]; Kapellas v. Kofman, supra, 1 Cal.3d at pp. 35-36.)
(3) As an additional preliminary matter, it also bears emphasis that a motion for summary judgment in First Amendment cases is an approved procedure because unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights and because speedy resolution of cases involving free speech is desirable (Good Government Group of Seal Beach, Inc. v. Superior Court (1978) 22 Cal.3d 672, 685 [150 Cal. Rptr. 258, 586 P.2d 572]; Desert Sun Publishing Co. v. Superior Court (1979) 97 Cal. App.3d 49, 53 [158 Cal. Rptr. 519]). (4) While the crucial test as to whether to grant a motion for summary judgment remains the same in free speech cases (i.e., whether there is a triable issue of fact presented in the case), the courts impose more stringent burdens on one who opposes the motion and require a showing of high probability that the plaintiff will ultimately prevail in the case. In the absence of such showing the courts are inclined to grant the motion and do not permit the case to proceed beyond the summary judgment stage (i.e., United Medical Laboratories v. Columbia Broadcasting Sys. (9th Cir.1968) 404 F.2d 706, 712-713; Time, Inc. v. McLaney (5th Cir.1969) 406 F.2d 565, 572-573; Time, *1047 Inc. v. Johnston (4th Cir.1971) 448 F.2d 378, 383-384; Belli v. Curtis Pub. Co. (1972) 25 Cal. App.3d 384, 388 [118 Cal. Rptr. 370]).
(5a),(6a) When viewed in light of the aforegoing principles, the summary judgment in this case must be upheld on two grounds. First, as appears from the record properly considered for the purposes of summary judgment, the facts disclosed by the articles were not private facts within the meaning of the law. Second, the record likewise reveals on its face that the publications in dispute were newsworthy and thus constituted a protective shield from liability based upon invasion of privacy.

(A) The facts published were not private.

(7) As pointed out earlier, a crucial ingredient of the tort premised upon invasion of one's privacy is a public disclosure of private facts (Forsher v. Bugliosi, supra, 26 Cal.3d at p. 808; Kapellas v. Kofman, supra, 1 Cal.3d at p. 35), that is, the unwarranted publication of intimate details of one's private life which are outside the realm of legitimate public interest (Johnson v. Harcourt, Brace, Jovanovich, Inc. (1974) 43 Cal. App.3d 880, 891 [118 Cal. Rptr. 370]). In elaborating on the notion, the cases explain that there can be no privacy with respect to a matter which is already public (Werner v. Times-Mirror Co. (1961) 193 Cal. App.2d 111, 117 [14 Cal. Rptr. 208]) or which has previously become part of the "public domain" (Kapellas v. Kofman, supra, 1 Cal.3d at pp. 36-37, fn. 24). Moreover, it is equally underlined that there is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public or when the further publicity relates to matters which the plaintiff leaves open to the public eye (Virgil v. Time, Inc., supra, 527 F.2d at p. 1126; see also com. c to § 652D of Rest. 2d Torts).
(5b) The case at bench falls within the aforestated rules. The undisputed facts reveal that prior to the publication of the newspaper articles in question appellant's homosexual orientation and participation in gay community activities had been known by hundreds of people in a variety of cities, including New York, Dallas, Houston, San Diego, Los Angeles and San Francisco. Thus, appellant's deposition shows that prior to the assassination attempt appellant spent a lot of time in "Tenderloin" and "Castro," the well-known gay sections of San Francisco; that he frequented gay bars and other homosexual gatherings in both San Francisco and other cities; that he marched in gay parades on several occasions; that he supported the campaign of Mike Caringi for the election of "Emperor"; that he participated in the coronation of the "Emperor" and sat at Caringi's table on that occasion; that his friendship with Harvey Milk, another prominent gay, was well-known and publicized in gay newspapers; and that his homosexual association and name *1048 had been reported in gay magazines (such as Data Boy, Pacific Coast Times, Male Express, etc.) several times before the publications in question. In fact, appellant quite candidly conceded that he did not make a secret of his being a homosexual and that if anyone would ask, he would frankly admit that he was gay. In short, since appellant's sexual orientation was already in public domain and since the articles in question did no more than to give further publicity to matters which appellant left open to the eye of the public, a vital element of the tort was missing rendering it vulnerable to summary disposal.
(8) Although the conclusion reached above applies with equal force to all respondents, we cannot help observing that respondents Times Mirror and its editor are exempt from liability on the additional ground that the Los Angeles Times only republished the Chronicle article which implied that appellant was gay. It is, of course, axiomatic that no right of privacy attaches to a matter of general interest that has already been publicly released in a periodical or in a newspaper of local or regional circulation (Sperry Rand Corporation v. Hill (1st Cir.1966) 356 F.2d 181, 185 [23 A.L.R.3d 853]).

(B) The publication was newsworthy.

(6b) But even aside from the aforegoing considerations, the summary judgment dismissing the action against respondents was justified on the additional, independent basis that the publication contained in the articles in dispute was newsworthy.
(9) As referred to above, our courts have recognized a broad privilege cloaking the truthful publication of all newsworthy matters. Thus, in Briscoe v. Reader's Digest Association, Inc., supra, 4 Cal.3d at page 541, our Supreme Court stated that a truthful publication is protected if (1) it is newsworthy and (2) it does not reveal facts so offensive as to shock the community notions of decency. (10) While it has been said that the general criteria for determining newsworthiness are (a) the social value of the facts published; (b) the depth of the article's intrusion into ostensibly private affairs; and (c) the extent to which the individual voluntarily acceded to a position of public notoriety (Briscoe v. Reader's Digest Association, Inc., supra, at p. 541; see also Forsher v. Bugliosi, supra, 26 Cal.3d at pp. 811-812; Kapellas v. Kofman, supra, 1 Cal.3d at p. 36), the cases and authorities further explain that the paramount test of newsworthiness is whether the matter is of legitimate public interest which in turn must be determined according to the community mores. As pointed out in Virgil v. Time, Inc., supra, 527 F.2d at page 1129: "`In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions *1049 of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern.'" (Italics added.) (Accord Rest. 2d Torts, § 652D, com. h.)
(6c) In the case at bench the publication of appellant's homosexual orientation which had already been widely known by many people in a number of communities was not so offensive even at the time of the publication as to shock the community notions of decency. Moreover, and perhaps even more to the point, the record shows that the publications were not motivated by a morbid and sensational prying into appellant's private life but rather were prompted by legitimate political considerations, i.e., to dispel the false public opinion that gays were timid, weak and unheroic figures and to raise the equally important political question whether the President of the United States entertained a discriminatory attitude or bias against a minority group such as homosexuals.[2] Thus appellant's case squarely falls within the language of Kapellas in which the California Supreme Court emphasized that "when, [as here] the legitimate public interest in the published information is substantial, a much greater intrusion into an individual's private life will be sanctioned, especially if the individual willingly entered into the public sphere." (Kapellas v. Kofman, supra, 1 Cal.3d at p. 36.)
Appellant's contention that by saving the President's life he did not intend to enter into the limelight and become a public figure can be easily answered. (11) In elaborating on involuntary public figures, Restatement Second of Torts section 652D, comment f, sets out in part as follows: "There are other individuals who have not sought publicity or consented to it, but through their own conduct or otherwise have become a legitimate subject of public interest. They have, in other words, become `news.' ... These persons are regarded as properly subject to the public interest, and publishers are permitted to satisfy the curiosity of the public as to its heroes, leaders, villains and victims, and those who are closely associated with *1050 them. As in the case of the voluntary public figure, the authorized publicity is not limited to the event that itself arouses the public interest, and to some reasonable extent includes publicity given to facts about the individual that would otherwise be purely private." (See also com. g.) (Accord Virgil v. Time, Inc., supra, 527 F.2d at p. 1129.)
In summary, appellant's assertion notwithstanding, the trial court could determine as a matter of law that the facts contained in the articles were not private facts within the purview of the law and also that the publications relative to the appellant were newsworthy. Since the record thus fails to present any triable issue of fact, the trial court was justified (if not mandated) in granting summary judgment and dismissing the case against respondents by way of summary procedure.
The purported appeal from the order denying a motion for new trial is dismissed as the order is not an appealable order.
The judgment is affirmed.
Poche, J., and Panelli, J., concurred.
A petition for a rehearing was denied May 7, 1984, and appellant's petition for a hearing by the Supreme Court was denied June 21, 1984.
NOTES
[1] For example, the September 25, 1975, issue of the Los Angeles Times wrote inter alia as follows: "A husky ex-marine who was a hero in the attempted assassination of President Ford emerged Wednesday as a prominent figure in the gay community.

"And questions were raised in the gay community if Oliver (Bill) Sipple, 32, was being shunned by the White House because of his associations.
"Sipple, who lunged at Sara Jane Moore and deflected her revolver as she fired at the President, conceded that he is a member of the `court' of Mike Caringi, who was elected `emperor of San Francisco' by the gay community.
"A column item in a morning newspaper here strongly implied Wednesday that Sipple is gay.
".... .... .... .... .... .... .
"Harvey Milk, a prominent member of this city's large homosexual community and a longtime friend of Sipple, speculated Wednesday that the absence of a phone call or telegram of gratitude from the White House might not be just an oversight."
[2] For example, the Los Angeles Times reporters explained the newsworthiness of the publication in the following language: "First, since Sipple publicly performed a heroic act of national and international significance, reporting his connections to the gay community presented information contrary to the stereotype of homosexuals as lacking vigor  a concept apparently much desired to be reported by activist members of the San Francisco gay community.

"Second, the intimation that the President of the United States had refrained from expressing normal gratitude to an individual who perhaps had saved his life raised significant political and social issues as to whether the President entertained discriminatory attitudes toward a minority group, namely, homosexuals."