Bret MICHAELS, Plaintiff,

v.

INTERNET ENTERTAINMENT GROUP, INC., a Delaware corporation; Westwood One Radio Networks, Inc., a Delaware corporation; Tom Leykis, an individual, Defendants,

Pamela Anderson LEE, Intervenor,

v.

INTERNET ENTERTAINMENT GROUP, INC., a Delaware corporation; Westwood One Radio Networks, Inc., a Delaware corporation; "Hard Copy", business form unknown; Paramount Pictures, Corp., a corporation; Viacom, Inc., a corporation; et al., Defendants.

No. CV 98–0583 DDP (CWX).

United States District Court, C.D. California.

April 27, 1998.

Edwin McPherson, Richard W. Davis, McPherson & Kalmansohn, Los Angeles, CA, for Bret Michaels.

Kelli L. Sager, Karen N. Frederiksen, Alfonzo B. Wickers, IV, Davis Wright Tremaine, Los Angeles, CA, for Paramount Pictures Corp. and Viacom Inc.

Alan L. Isaacman, Steven H. Blackman, Isaacman Kaufman & Painter, Beverly Hills, CA, Derek Alan Newman, Derek A. Newman

Law Offices, Seattle, WA, for Internet Entertainment Group, Inc.

George M. Belfield, David L. Burg, Goldberg Scott Belfield & Cohen, Los Angeles, CA, for Westwood One Radio Networks, Inc.

Edward L. Masry, Louanne Masry Weeks, David Edward Weeks, Masry & Vititoe, Westlake Village, CA, for Pamela Anderson Lee.

## PRELIMINARY INJUNCTION

PREGERSON, District Judge.

This matter comes before the Court on the motions of the plaintiff, Bret Michaels ("Michaels"), and the intervenor, Pamela Anderson Lee ("Lee") (collectively, the "plaintiffs"), for a preliminary injunction to prevent dissemination of a videotape ("the Tape") in which Michaels and Lee claim a copyright. Dissemination of the Tape by defendant Internet Entertainment Group, Inc. ("IEG") is currently prohibited by this Court's Temporary Restraining Order ("TRO"), issued February 27, 1998. IEG has consented to several extensions of the TRO.

The Court, having considered the declarations and exhibits submitted by the parties, the parties' written and oral arguments, and the applicable legal authorities, concludes that the plaintiffs have made the requisite showing of likelihood of success on the merits and irreparable injury on their copyright claims. Therefore, the Court preliminarily enjoins defendant IEG from distributing the Tape.

In addition, the Court finds that the plaintiffs have made the requisite showing of likelihood of success on the merits of their claim for violation of the state law right to publicity, as well as the possibility of irreparable injury. The Court therefore enjoins IEG from using the plaintiffs' names, likenesses or identities for the purpose of advertising, selling, marketing, or soliciting purchases of goods or services.

Finally, the Court finds that the plaintiffs have made the requisite showing of likelihood of success on the merits of their claim for violation of the right to privacy, as well as the possibility of irreparable injury. The Court therefore enjoins IEG from publishing, copying, distributing or otherwise disseminating the Tape.

The Court orders that a $50,000 bond shall be deemed adequate security for the payment of such costs and damages that may be incurred by the defendants if the relief herein is found to have been improvidently granted. Lee is directed to provide security for one-half of the $50,000 bond.

### I. Background

#### A. *Factual and Procedural Background*

Michaels is a musician, best known as the lead singer of the rock band "Poison." Michaels asserts that he is now engaged in a second career as a feature film director. (Complaint ¶ 1.) Lee is a well-known television and film actor. (Complaint In Intervention ¶ 4.)

Defendant IEG is a corporation involved in the distribution of adult entertainment material through a subscription service on the Internet.

On or about October 31, 1994, Michaels and Lee recorded the Tape, which depicts them having sex.

On December 31, 1997, Michaels received a letter from IEG claiming that IEG had acquired the Tape and all rights necessary to publish the Tape. (*See* McPherson Decl. (Mar. 6, 1998) Ex. A.)

On January 12, 1998, Michaels wrote to IEG through counsel to advise IEG that Michaels had not authorized any distribution of the Tape, and notifying IEG that any publication of the Tape would violate Michaels's copyright therein, as well as his common law and statutory rights to privacy and publicity involving his name and likeness. (*See id.* Ex. C.) The letter denied that any third party had the right to convey Michaels's interest in the Tape. The letter included a demand that IEG cease and desist from attempts to disseminate or exploit the Tape.

On January 22, 1998, Michaels registered the Tape with the Register of Copyrights as an audiovisual work entitled "Private Home

Tape" and authored by Michaels. (*See* Complaint Ex. A.)

Michaels filed this action on January 23, 1998, alleging five claims: (1) copyright infringement against IEG; (2) false designation of origin under the Lanham Act against IEG; (3) state-law invasion of privacy based on publicity of the Tape over Westwood One's radio affiliates against all defendants; (4) violation of the California common law right of publicity against all defendants; and (5) violation of the California statutory right of publicity under California Civil Code section 3344 against all defendants. In addition, Michaels's complaint includes a sixth cause of action which is a prayer for injunctive relief on all claims.

Also on January 23, 1998, Michaels applied ex parte for a temporary restraining order to prohibit the defendants from duplicating, publishing, promoting, marketing or advertising the Tape. The application alleged that IEG announced that it would publish the Tape on its Internet subscription service, "ClubLove," on Monday, January 26, 1998. The Court issued the TRO on January 23, 1998. The Court required that Michaels post a $50,000 bond. The Court scheduled a preliminary injunction hearing for February 2, 1998.

On January 30, 1998, the Court granted IEG's ex parte application to continue the preliminary injunction hearing to February 12, 1998. IEG consented to an extension of the TRO. At the same time, the Court ordered the parties to draft a stipulated protective order that would facilitate IEG's disclosure of the purported "agent" of Michaels who, according to IEG, sold Michaels's rights in the Tape to IEG.

On February 9, 1998, the Court granted IEG's request for a further continuance due to IEG's change of counsel. IEG consented to an extension of the TRO until the Court ruled on the preliminary injunction.

After February 9, 1998, IEG provided Michaels with a copy of an agreement between the "agent" and IEG. The agreement is in the form of a confirming letter from IEG to the "agent." (McPherson Decl. Ex. J.) The letter is to Jose A. Revilla ("Revilla"), a private investigator. It is authored by IEG staff counsel Derek Newman, who states that the letter is to confirm the agreement between IEG, Revilla and Revilla's "undisclosed client" to convey rights in the Tape. The letter states that Revilla agrees to convey the Tape and any rights Revilla might have therein to IEG for $16,500. IEG also agrees to pay Revilla $15,000 more if it commercially distributes the Tape at retail for fourteen consecutive days. The letter is signed by Revilla.

On February 23, 1998, the Court heard oral argument on Michaels's motion for contempt sanctions against IEG for failure to comply with the TRO. The Court denied the motion, issued a modified TRO on February 27, 1998, and ordered IEG to show cause on April 10, 1998 regarding the issuance of a preliminary injunction.

On March 4, 1998, IEG deposed Lee. On March 10, 1998, IEG deposed Michaels.

On March 30, 1998, IEG deposed Revilla. Before answering any substantive questions, Revilla read a statement advising the parties that he would not reveal the name of his client. (Revilla Depo. at 13:18.) Revilla did assert, however, that the client was an associate of Michaels who had received a copy of the Tape as a gift. The unnamed client told Revilla that he did not believe that Michaels had conveyed with the physical Tape any right to further disseminate it. (Revilla Depo. at 21.) Revilla testified that he concluded that the client had no rights in the Tape to convey, and that in Revilla's negotiations with IEG and other media outlets, Revilla made it clear that he was offering only the physical Tape, not any intellectual property rights in the expression fixed on the Tape. (Revilla Depo. at 13–14.) The Revilla deposition has not been completed. Revilla asked that the deposition be suspended to give him time to consult with counsel. The deposition has not resumed because of a dispute between Revilla and Michaels over videotaping the deposition.

On April 1, 1998, Lee applied ex parte to intervene in this action. The Court granted her application. The Court continued the preliminary injunction hearing to April 27,

1998 to allow time for briefing by Lee and further briefing by the other parties.

On April 10, 1998, IEG applied ex parte for an order compelling Revilla to disclose the name of his client. The Court denied the ex parte application.

## II. Discussion

### A. Legal Standard For Preliminary Injunction

■ In the Ninth Circuit, the party seeking a preliminary injunction must show either (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted, or (2) the existence of serious questions governing the merits and that the balance of hardships tips in its favor. *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824 (9th Cir.1997). These standards "are not separate tests but the outer reaches of a single continuum." *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.1993) (internal quotation marks omitted).

### B. Copyright Claims

The Copyright Act authorizes the court to grant preliminary and permanent injunctions "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).

■ Where a copyright plaintiff succeeds in showing a likelihood of success on the merits, irreparable injury is presumed. It is well-settled that money damages cannot compensate for the harm caused by copyright infringement. *See Cadence*, 125 F.3d at 827–28.

### 1. Likelihood of Success on the Merits

■ To establish copyright infringement, the plaintiff must prove two elements: (1) ownership of valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publs., Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 360, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991).

### a. Ownership of Copyright

Both Michaels and Lee have registered their copyrights in the Tape. Registration certificates are prima facie evidence that the plaintiff owns a valid copyright. 17 U.S.C. § 410(c). Presentation of the certificates shifts the burden to the defendants to overcome the presumption of validity. IEG does not dispute Michaels's or Lees' ownership of a copyright. (See Opp'n at 2:13.) IEG contests not the existence of Michaels's or Lee's rights, but the exclusivity of their rights, based on IEG's contention that it acquired a license from Michaels through Revilla.

There is a dispute between Michaels and Lee over whether the copyright is owned solely by Michaels or jointly by Michaels and Lee. The question of joint or sole ownership is only tangentially related to the question of whether a preliminary injunction should issue. As discussed below, IEG does not claim to own a copyright in the Tape. IEG claims only to have received a non-exclusive license to distribute the Tape on the Internet. IEG presents no direct or circumstantial evidence that such a license might have come from Lee. The issue of whether IEG has a license to distribute the Tape, therefore, does not require the Court to resolve the conflict between Michaels and Lee over joint ownership. The Court notes that neither Michaels nor Lee has rebutted the prima facie evidence of Lee's joint ownership. The Court therefore presumes for purposes of this motion that Lee is a joint owner of the copyright, and that she was and is legally capable of granting a license to IEG.

### b. Copying of Original Elements

■ IEG does not dispute that the tape it seeks to distribute on the Internet is an exact copy of the Tape made by Michaels and Lee. Copying constitutes infringement if it conflicts with one of the specific exclusive rights conferred by the Copyright Act. *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). The Copyright Act confers on owners the exclusive rights to reproduce the work, prepare derivative works, distribute copies to the public, to perform the work publicly, and to display the work publicly. 17 U.S.C. §§ 106(1)-(5).

Distribution of the Tape on the Internet would conflict with the plaintiffs' exclusive

rights to distribute copies of the Tape to the public. 17 U.S.C. § 106(4). It would also interfere with the plaintiffs' public display rights, which include the right to display "individual images of a motion picture." 17 U.S.C. § 106(5). Therefore, display of still images from the Tape on the Internet would also conflict with rights conferred exclusively on the plaintiffs by the Copyright Act.

### c. *IEG's Affirmative Defense That It Has A License*

■ It is an affirmative defense to copyright infringement that the alleged infringer has received a license from the owner. *See Rano v. Sipa Press, Inc.*, 987 F.2d 580, 585 (9th Cir.1993).

IEG contends that Michaels and Lee will not succeed on the merits of the copyright infringement action because IEG purchased a non-exclusive license to distribute the Tape from Revilla. IEG relies on the principle that a non-exclusive license may be transferred without a written contract. The contract to transfer a non-exclusive license may be oral; and where evidence is lacking to prove the contract's existence, it may be inferred from the conduct of the parties.

■ IEG's statement of the law is correct. The Copyright Act contains a statute of frauds which invalidates a purported transfer of copyright ownership unless it is in writing. 17 U.S.C. § 204(a); *see also Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir.1990) (explaining the purposes of the writing requirement). A narrow exception exists for non-exclusive licenses, which are not ownership interests and therefore "may be granted orally or may even be implied from conduct." 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.03[A][7], at 10–43 (1997). "When the totality of the parties' conduct indicates an intent to grant such permission, the result is a nonexclusive license." *Id.*

Thus, in *Effects Associates*, the Ninth Circuit inferred a license from the following conduct: The defendant, a horror film producer, engaged the plaintiff, a special effects company, to create effects for a new horror movie. 908 F.2d at 555–56. The parties agreed upon a price. The plaintiff delivered the footage. The defendant was unhappy with the footage, and paid only half of the promised amount. The defendant, however, used the footage in the film. The plaintiff sued for copyright infringement. The district court and the Ninth Circuit concluded that the parties' conduct created an implied license to use the effects footage in the film. *Id.* at 558.

IEG contends that an implied license arises from the facts surrounding IEG's acquisition of the Tape. IEG offers two related chains of reasoning. First, IEG contends that the inconsistencies between Michaels's and Lee's respective depositions gives rise to an inference that one of them conveyed a license to distribute the Tape. Second, IEG contends that the Revilla deposition and recent statements made by Revilla's counsel to IEG's counsel support an inference that Michaels authorized an associate to negotiate a license.

### (1) *Inconsistencies in the Michaels and Lee Depositions*

■ The first contention invites the Court to apply the maxim *falsus in uno, falsus in omnibus* to the depositions of Michaels and Lee. Both Michaels and Lee deny that they have ever conveyed any interest in the Tape. (Michaels Decl. (Mar. 6, 1998) ¶ 7; Lee Decl. (Apr 10, 1998) ¶ 6.)

IEG points to an inconsistency between Michaels's and Lee's depositions on two collateral issues, and invites the Court to infer from the inconsistency that one of the deponents must be lying, and that because one of them is lying about these collateral matters, one of them is lying about the central issue of whether he or she sought to distribute the Tape.

The collateral matters are whether Lee ever had a copy of the Tape, and whether Michaels ever promised Lee that he would destroy his copies of the Tape.[1] Michaels

---

1. These matters are collateral because IEG's possession of a physical copy of the Tape is not in dispute. Only IEG's right to distribute the Tape is in dispute. Although the inconsistencies between Michaels's and Lee's statements create uncertainty about the existence and location of

testified that he gave Lee a copy of the Tape. (Blackman Decl. Ex. B (Michaels Depo.) at 37:3.) Lee testified that she never received a copy. (Blackman Decl. Ex. C (Lee Depo.) at 52:18–19.) Lee testified that on several occasions she elicited from Michaels a promise to destroy all copies of the Tape. (Blackman Decl. Ex. C (Lee Depo.) at 49:6–24.) Michaels denies making such a promise. (Blackman Decl. Ex. B (Michaels Depo.) at 36:8.)

IEG contends that this inconsistency cannot be explained by differing recollections. Rather, according to IEG, these inconsistencies conclusively establish that one of the deponents is lying. IEG contends that the only reason that Michaels or Lee would lie about these collateral matters would be to hide the fact that one of them authorized distribution of the Tape. Because, in IEG's argument, no other explanation would account for these inconsistencies, IEG invites the Court to conclude that one of the parties authorized distribution of the Tape.

The Court rejects the contention that these inconsistencies give rise to a conclusion that Michaels or Lee conveyed a license to IEG. These inconsistencies are just as easily explained by the possibility of differing recollections or understandings of the events as they occurred. In addition, viewing the facts in the light most favorable to IEG, even if the Court inferred that either Michaels or Lee is lying to conceal the fact that one of them gave a copy of the Tape to an unknown agent for purposes of negotiating a distribution deal, there is no evidence from which the Court can determine the scope or duration of such an agent's authority, whether the authority was withdrawn, whether the authority was used to negotiate a license, or whether such a license would have required subsequent approval by Michaels or Lee.

#### (2) *The Revilla Transactions*

 IEG contends that Revilla's contacts with an unknown associate of Michaels resulted in the transfer of an implied non-exclusive license from Michaels to IEG. The Court concludes that this contention is inadequate to rebut the plaintiffs' showing of likelihood of success on the merits. The evidence does not support an inference that Michaels conveyed a license to any of the figures involved in the Revilla transactions.

Revilla testified that he was hired in April 1996 by an associate of Michaels, whom Revilla refused to name. The unnamed client wanted Revilla to investigate the possibility of selling the Tape. Revilla testified that his unnamed client told him that he received the Tape from Michaels as a gift.[2] (Revilla Depo. at 21:21–24.) Revilla testified that he believed that his client owned no intellectual property rights in the Tape, a conclusion that Revilla confirmed for himself by consulting several intellectual property attorneys. (*Id.* at 13:9–19.)

Revilla testified that he attempted to buy the rights to distribute the Tape from Michaels by contacting Michaels's agent on May 10 and May 17, 1996, at which time Revilla offered Michaels $1 million for rights to the Tape. (*Id.* at 14:19–21.) Revilla testified that Michaels, through his agent, Howard Kaufman, rejected the offer. (*Id.* at 14:25–15:4.)

Revilla testified that shortly after his conversation with Michaels's agent, Revilla learned that Michaels himself had begun attempting to sell the Tape to various media outlets. (*Id.* at 15:6–16:9.)

Revilla testified that his client contacted him again in December 1997 to inform him that IEG had acquired the rights to another videotape involving Lee, and to request that Revilla contact IEG to offer the Tape. (*Id.* at 16:17–22.) Revilla testified that he called

physical copies of the Tape, this uncertainty has no bearing on the question of intellectual property rights in the Tape.

**2.** Although the parties have not formally objected to the hearsay basis of this statement, Michaels notes in his moving papers that numerous hearsay objections arise from Revilla's deposition. Although Revilla's assertions about the statements of his unnamed client would be subject to

a hearsay objection at trial or at summary judgment, the Court may consider hearsay at the preliminary injunction stage. *See Sierra Club v. Federal Deposit Ins. Corp.*, 992 F.2d 545, 551 (5th Cir.1993); 11A Wright, Miller & Kane, *Federal Practice and Procedure* § 2949 at 217–18. At this stage of the proceedings, the hearsay nature of the assertions goes to their weight, not their admissibility.

IEG's president, Seth Warshavsky. (*Id.* at 16:23–24.)

Revilla states that he told Warshavsky that "I did not believe I had anything but a Tape." (*Id.* at 16:25–17:1.) Revilla states that on hearing this, Warshavsky dropped the offering price by "about 50 percent." (*Id.* at 17:3.) Revilla states that Warshavsky responded to the information that Revilla had no rights in the Tape by saying " 'I really only want the tape for publicity anyway.' " (*Id.* at 17:14–15.)

On December 19, 1997, Revilla and IEG entered into a letter agreement. (*See* McPherson Decl. (Mar. 6, 1998) Ex. J ("Letter Agreement").) IEG purchased the Tape and "all rights (suspected or unsuspected, known or unknown), if any, that Revilla has with regard to the Tapes and Video (including but not limited to copyright, trademark, and publicity)" and any such rights that Revilla might acquire in the future for $16,500 plus $15,000 if IEG commercially distributes the Tape for fourteen consecutive days. (*Id.*)

IEG has attempted to supplement the factual assertions of the Revilla deposition through a declaration of Steven H. Blackman, one of IEG's attorneys. (*See* Blackman Decl. (Apr. 20, 1998).) Blackman declares that after the Revilla deposition was suspended, he contacted Revilla's attorney, Andrew L. Ellis. (*Id.* ¶ 3.) Blackman says that Ellis said[3] that Ellis was preparing a retainer agreement under which Ellis would represent the unnamed client in addition to representing Revilla. (*Id.* ¶ 3.) Blackman said that Ellis said that the client would testify, if deposed, that Michaels gave him the Tape with instructions to "call the tabloid press to create interest in the Tape" and "to follow up on any initial publicity by arranging for distribution or dissemination of the Tape." (*Id.* ¶ 3.)

The Court finds that these factual circumstances do not support IEG's claim of an implied license. There is no evidence that Michaels turned over the Tape to IEG or to the unnamed agent under circumstances indicating his agreement that it be distributed on the Internet.

Even if the Court gave greater weight to the contents of the Blackman declaration than would be merited by the fact that it is three hearsay levels removed from an unnamed declarant, the Court could not infer the existence of a license. At most, the statement would establish that Michaels authorized the unnamed client to negotiate a license on Michaels's behalf, not that Michaels granted the unnamed client a license. The Court notes that after speaking with the client, Revilla contacted Michaels to offer him $1 million for the right to distribute the Tape. (Revilla Depo. at 14.) Such an offer would have been unnecessary if the client came to Revilla with authority to negotiate a license on Michaels's behalf.

Additionally, the plausibility of IEG's account of the facts is compromised by the monetary amounts involved. In order for the Court to imply a license under these facts, the Court would have to conclude that Michaels and his agents first refused to grant a license for $1 million, and six months later granted a license in the same property for $31,500. In the absence of a written contract, or other strong evidence to the contrary, the Court will not imply that the parties entered into a licensing agreement that defies economic rationality.

IEG asserts that a chain of title links it to Michaels through Revilla and the unnamed client. In this narrative, Michaels granted a non-exclusive license to distribute the Tape to the client, who conveyed the license to Revilla, who conveyed it to IEG. Or, to remove one link from the chain, the unnamed client conveyed the license to IEG by using Revilla as a negotiating agent.

Michaels and IEG dispute whether Revilla, if he had received an oral non-exclusive license from Michaels, could have then recon-

---

**3.** The Court notes Michaels's objection to the hearsay basis of this evidence. While expressing no view on the admissibility of this evidence at trial or summary judgment, the Court notes again that it may consider hearsay in determining whether to grant a preliminary injunction.

The inherent unreliability of the multiple hearsay at issue here goes to the weight of the evidence in determining whether the plaintiffs have demonstrated a likelihood of success on the merits. *See supra,* note 2.

veyed the license to IEG without Michaels's permission. The controlling authority on this point is *Harris v. Emus Records Corp.,* 734 F.2d 1329 (9th Cir.1984). In *Harris,* a recording company asserted that it had received a copyright license through a chain of title similar to the one asserted by IEG. *Id.* at 1331–32. The defendant, Emus Records, received from the plaintiff's licensee a conveyance similar to the one at issue here, transferring "whatever rights" the licensee had acquired. The defendant asserted that such a transfer included the license. The Ninth Circuit rejected this contention, holding that a copyright license itself does not include the right to transfer the license, unless the copyright owner explicitly conveys this right in addition to the license itself. *Id.* at 1333; *see also In re Patient Education Media, Inc.,* 210 B.R. 237, 240–41 (Bankr. S.D.N.Y.1997); *SQL Solutions, Inc. v. Oracle Corp.,* 1991 WL 626458 (N.D.Cal.1991).

IEG is correct in asserting that copyright owners and their licensees can contract around the non-transferability of licenses. The default rule of non-transferability, however, makes IEG's burden heavier in proving its license defense. It must prove not only that Michaels granted a license to the unnamed client, but also that Michaels's agreement with the unnamed client included a term allowing the license to be transferred to IEG without further consent from Michaels. There is no evidence that any purported non-exclusive license agreement between Michaels and the unnamed agent included the authority to transfer the license.

### 2. Conclusion as to Likelihood of Success on the Merits of the Copyright Action

■ In light of the evidence adduced at this stage of the litigation, and viewing IEG's assertions about evidence likely to be discovered in the light most favorable to IEG, IEG is not likely to meet its burden to prove the affirmative defense that it received a license to distribute the Tape. Because the plaintiffs have demonstrated that dissemination of the Tape on the Internet would meet the elements of copyright infringement, and because IEG has not proved that it is likely to succeed in its asserted affirmative defense,

the Court concludes that the plaintiffs are entitled to a preliminary injunction prohibiting acts that would violate their exclusive rights in the Tape under the Copyright Act.

### 3. Fair Use

■ IEG contends that the copyright injunction should be tailored to allow IEG to use "small portions" of the Tape in the course of public discussions because such dissemination of the Tape would constitute fair use. (Opp'n to Michaels's Mot'n at 21:7.)

Section 107 of the Copyright Act, entitled "Limitations on exclusive rights: Fair use" provides that

[n]otwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107.

### a. Purpose and Character of the Use

IEG's proposed use of the Tape is commercial. IEG's president has declared that IEG builds its subscriber base by promising and delivering digital images from "celebrity video tapes." (Warshavsky Decl. (Jan. 26, 1998) ¶ 18.) The commercial nature of IEG's

proposed display of short segments of the Tape weighs against a finding of fair use. *See Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985). That IEG would use short segments in connection with reporting or comment on the newsworthiness of the Tape does not make its proposed use less commercial. IEG "stands to profit from exploitation of the copyrighted material" to the extent that IEG's news reporting raises interest in the Tape among current and potential subscribers. *Id.*

IEG's proposal to use short segments or still images from the Tape is consistent with its commercial purpose. Still images and short video clips are the stock-in-trade of Internet adult entertainment businesses. *See generally Playboy Enterprises Inc. v. Webbworld Inc.*, 991 F.Supp. 543, 45 U.S.P.Q.2d 1641 (N.D.Tex.1997); *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*, 982 F.Supp. 503 (N.D.Ohio 1997). IEG's proposed use of short segments of the Tape corresponds precisely with the most likely form of distribution and display of the Tape on the Internet. The nature of the use therefore conflicts directly with the exclusive rights of the copyright owners.

This situation is to be contrasted with the display on television of short segments of a theatrical motion picture for purposes of comment or criticism. Display of such short segments is fair use because it does not conflict with the form of display that is valuable to the copyright owner—display of the entire motion picture in a theater. Here, on the other hand, because of the nature of the adult entertainment business on the Internet, the commercial value of the Tape lies as much in the display of brief images as in display of the entire Tape.

In light of the foregoing the Court finds that this factor weighs heavily against a finding of fair use in display of short segments of the Tape.

b. *Nature of the Copyrighted Work*

Here, the copyrighted work is a Tape of the plaintiffs engaged in sexual activity. The plaintiffs have declared that they made this Tape for their personal use only with no intent of publishing it at any time. (Michaels Decl. (Mar. 6, 1998) ¶ 5; Lee Decl. (Apr. 10, 1998) ¶ 5.) IEG has not controverted this evidence as to the nature of the work. "The fact that a work is unpublished is a critical element of its 'nature.'" *Harper & Row*, 471 U.S. at 564, 105 S.Ct. at 2232.

IEG contends that the recent dissemination of a 148–second clip from the Tape on an Internet site in the Netherlands establishes that the work has already been published. (*See* Marrison Decl. Exs. K & J.) The Court, however, rejects the contention that one illicit publication of a portion of the work negates the copyright owner's exclusive display and distribution rights under Section 106. The inquiry for purposes of fair use is whether the owner has previously published the work, thereby making the work available for public discussion and fair use. Here, IEG has presented no evidence that the plaintiffs posted the 148–second clip on the Internet. The plaintiffs' interest in controlling the first authorized publication of the Tape, therefore, still weighs against fair use.

The inquiry into the nature of the work must also address the degree to which the work expresses facts or ideas in such a way as to make discussion of these facts or ideas difficult without quotation of the work. If the copyrighted work depicts ideas or facts in such a way as to require quotation of the work in order for the public to discuss the ideas or facts contained in the work, such quotations are likely to be fair use. *See Harper & Row*, 471 U.S. at 563, 105 S.Ct. at 2232 (noting that some brief quotes from President Ford's memoir would be necessary to adequately convey the ideas recorded therein). From the descriptions of the Tape presented to the Court, it does not seem likely that the portrayal of two people engaged in sexual relations on the Tape constitutes a set of facts or ideas whose discussion requires seeing the Tape.

This factor weighs against a finding of fair use of short segments of the Tape.

c. *Amount and Substantiality of the Portions Used*

This factor looks not only at the simple proportion of the work used, but also at the

relative importance of the parts used. *Id.* at 565–66, 105 S.Ct. at 2233. As discussed above, the Tape's value as Internet adult entertainment lies in the use of individual images or small segments. The power to exploit this value belongs to the plaintiffs as copyright owners. Because the use of a even short segment by IEG would usurp this power, the fact that IEG proposes to use only few seconds of the work does not in this case weigh in favor of fair use.

### d. *Effect on the Market*

To negate fair use, the plaintiffs "need only show that if the challenged use 'should become widespread it would adversely affect the *potential* market for the copyrighted work.'" *Id.* at 568, 105 S.Ct. at 2234 (quoting *Sony,* 464 U.S. at 451, 104 S.Ct. at 793).

If IEG were to use images or segments from the Tape on the Internet, those segments would become available for copying and further dissemination. The nature of the Internet is such that users can easily copy and transmit images viewed on web sites such as IEG's. *See Hardenburgh,* 982 F.Supp. at 505–06. IEG has presented evidence of extensive interest among Internet users in text and images regarding Lee. (*See* Freimuth Decl. (Apr. 20, 1998) Exs. H–J.) The Court infers from these facts that were IEG to disseminate short segments of the Tape under the guise of fair use, these segments would propagate quickly through the Internet, saturating the potential market for the plaintiffs' copyrighted work.

This factor therefore weighs against a finding of fair use.

### e. *Conclusion as to Fair Use*

In balancing the fair use factors, the Court concludes that the nature of the plaintiffs' copyrighted work is such that the display or distribution of images or short segments by IEG would destroy the value of the plaintiffs' exclusive rights in the work. Such display or distribution therefore cannot constitute fair use. The Court rejects IEG's request that the injunction be tailored to allow display or distribution of any part of the Tape.

### C. *Right to Publicity*

Under California law, the plaintiffs own the right to exploit their names and likenesses for commercial gain. The common law of California recognizes this right of publicity in a person's name, likeness and identity. *See Midler v. Ford Motor Company,* 849 F.2d 460, 462 (9th Cir.1988). The California legislature has created a statutory right of publicity in a person's "name, voice, signature, photograph, or likeness." Cal. Civ.Code § 3344(a). The statutory right complements, rather than codifies, the common law right. This distinction is important because the common law right protects a broader range of interests against a broader range of infringing conduct than does the statutory right. *See White v. Samsung Electronics America, Inc.,* 971 F.2d 1395, 1397–99 (9th Cir.1992); *Eastwood v. Superior Court (National Enquirer),* 149 Cal.App.3d 409, 198 Cal.Rptr. 342, 346 n. 6 (1983).

Under California law, the plaintiffs may seek to protect their rights of publicity through an action for damages. The plaintiffs may also seek to enjoin others from exploiting their names or likenesses at all. *See Lugosi v. Universal Pictures,* 25 Cal.3d 813, 160 Cal.Rptr. 323, 328, 603 P.2d 425 (Cal.1979); *Eastwood,* 198 Cal.Rptr. at 348.

### 1. *Copyright Preemption*

IEG contends that the claim for violation of the right to publicity is preempted by the Copyright Act. The Copyright Act of 1976 (the "Act") explicitly preempts "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright" as defined by the Act. 17 U.S.C. § 301(a).

The Copyright Act sets forth a two-part test for determining whether a state law claim is preempted. First, the work on which the state law claim is based must be within the subject matter of copyright, i.e., the state law claim must arise from rights in a work of authorship fixed in a tangible medium of expression. *See* 17 U.S.C. § 301(b)(1). Second, the state law claim must assert rights that are equivalent to the exclusive rights specified by Section 106 of

the Act, i.e., the right to prohibit reproduction, creation of derivative works, performance, distribution, or display of a work. *See* 17 U.S.C. § 301(b)(3); *see also,* 1 Nimmer § 1.01[B] at 1–10.

 In order to apply the second prong, courts focus on whether the state claim has an "extra element" that differentiates it from the rights protected by federal law. "Preemption analysis involves determining whether the state law claim contains an element not shared by the federal law; an element which changes the nature of the action so that it is *qualitatively* different from a copyright . . . infringement claim." *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.,* 7 F.3d 1434, 1439–40 (9th Cir.1993) (emphasis added) (internal quotation marks omitted).

 IEG correctly states that the state law right to publicity action is preempted where the conduct alleged to violate the right consists only of copying the work in which the plaintiff claims a copyright. *See Fleet v. CBS. Inc.,* 50 Cal.App.4th 1911, 58 Cal. Rptr.2d 645, 649 (1996); *Motown Record Corp. v. George A. Hormel & Co.,* 657 F.Supp. 1236, 1240 (C.D.Cal.1987). A right to publicity claim is not preempted, however, where the claim contains elements that are different in kind from copyright infringement. *See Wendt v. Host Int'l, Inc.,* 125 F.3d 806, 810 (9th Cir.1997) (declining to extend *Fleet* beyond right to publicity claims that allege no conduct other than copying a copyrighted work).

 Here, the plaintiffs have alleged that the defendants have used their names, likenesses and identities on radio, television and the Internet to advertise the imminent distribution of the Tape. (Complaint ¶¶ 36–38; Complaint in Intervention ¶¶ 18, 48–52, 59.) This conduct is unrelated to the elements of copyright infringement, which are concerned only with distribution of the Tape itself.

The Court therefore rejects the contention that the claims for right to publicity are preempted by the Copyright Act.

### 2. *Likelihood of Success on the Merits*

 The elements of a common law right to publicity claim are "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercial or otherwise; (3) lack of consent; and (4) resulting injury." *Eastwood,* 198 Cal.Rptr. at 347. The statutory cause of action under section 3344 requires two additional elements: knowing use of the plaintiff's name, photograph of likeness for purposes of advertising or solicitation of purchases, and a "direct connection" between the use and the commercial purpose. *Id.*

 The first element, use of the plaintiffs' names and identities, is satisfied by evidence that IEG used the plaintiffs' names and bodily descriptions to promote the tape on television and radio. (*See* Michaels Decl. (Mar. 6, 1998) ¶ 10; McPherson Decl. (Mar. 6, 1998) ¶¶ 12, 13; Lee Decl. (Apr. 10, 1998) ¶ 8.)

The second element, commercial advantage, is satisfied by IEG's statements regarding the nature of its business. IEG is a subscription service with approximately 100,000 members, each of whom pay $14.95 per month. (Warshavsky Decl. (Jan. 26, 1998) ¶ 12.) IEG's president estimated that up to one-third of its paying members would cancel their subscriptions if IEG did not deliver the Tape. (*Id.* ¶ 16.)

The third element, lack of consent, is not seriously contested. IEG's assertion that Michaels or Lee secretly licensed it to distribute the Tape is not supported by any evidence and is controverted by Michaels's and Lee's declarations and deposition testimony. If IEG had come forward with evidence of consent, this element might require an evidentiary hearing in order for the Court to weigh the credibility of conflicting testimony. Under these circumstances, however, the evidence of lack of consent is uncontroverted.

The fourth element, injury, is satisfied by two showings. First, if IEG's membership revenue has increased due to its use of the plaintiffs' names and likenesses, IEG has deprived the plaintiffs of money they could

have made by exploiting their right to publicity on their own or through licensees. Second, the plaintiffs have presented evidence that publicity in association with pornography has damaged their attempts to establish and maintain careers in mainstream entertainment. (*See* Michaels Decl. (Mar. 6, 1998) ¶¶ 2–3; Lee Decl. (Apr. 10, 1998) ¶¶ 2–3.)

Lee has submitted a declaration by entertainment lawyer Henry Holmes, who states that in his opinion, Lee's prospects as an actor and endorser of products will be damaged by publicity in association with pornography. (Holmes Decl. (Apr. 13, 1998).)

The Court also finds that the statutory elements are satisfied. IEG knew that it was using the plaintiffs' names and likeness in connection with promotion of the Tape. The use of their names and likenesses was directly connected with promotion of the Tape.

In light of the foregoing, the Court concludes that the plaintiffs have demonstrated a likelihood of success on the merits of their claim for violation of the California common law and statutory right to publicity.

### 3. *Irreparable Injury*

 Several courts have held that a celebrity's property interest in his name and likeness is unique, and cannot be adequately compensated by money damages. *See Ali v. Playgirl, Inc.,* 447 F.Supp. 723, 729 (S.D.N.Y. 1978); *Uhlaender v. Henricksen,* 316 F.Supp. 1277, 1283 (D.Minn.1970); *see generally* 1 J. Thomas McCarthy, *Rights of Publicity & Privacy* § 11.6[B] (1997).

The plaintiffs have submitted evidence that they have invested years of effort in establishing their public personae, and that their ability to exploit their investments will be irreparably harmed by exploitation of their names and likeness in connection with the marketing of the Tape. (Michaels Decl. (Mar. 6, 1998) ¶¶ 2–3; Lee Decl. (Apr. 10, 1998) ¶¶ 2–3; Holmes Decl.) The Court concludes

based on this evidence that the plaintiffs have made the requisite showing of irreparable injury.

### 4. *Necessity to Tailor Relief To Avoid Invalid Prior Restraint*

 While the plaintiffs have an exclusive right to exploit their names and likenesses for commercial purposes, they do not have an exclusive right to the use of their names and likenesses in the publication of matters of public interest. California's publicity statute specifically exempts "use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign." Cal. Civ.Code § 3344(d). Courts applying the common law right of publicity have recognized that the First Amendment requires a similar exemption for uses in connection with matters of public interest. *See Eastwood,* 198 Cal.Rptr. at 349; *Cher v. Forum Int'l, Ltd.,* 692 F.2d 634, 639 (9th Cir.1982).

The plaintiffs are entitled to an injunction against uses of their names or likenesses to sell the Tape. The injunction may not reach the use of their names or likenesses to report or comment on matters of public interest. Nor may it reach the use of their names or likenesses to attract attention to IEG as a news medium. *See Cher,* 692 F.2d at 639 (holding that use of a person's name or likeness to advertise a magazine is not actionable provided that advertisement does not falsely claim endorsement); *Montana v. San Jose Mercury News,* 34 Cal.App.4th 790, 40 Cal. Rptr.2d 639, 642 (1995).

Crafting an injunction to prevent irreparable injury arising from violation of the plaintiffs' rights to publicity requires "a weighing of the private interest of the right of publicity against matters of public interest calling for constitutional protection, and a consideration of the character of these competing interests." [4] *Eastwood,* 198 Cal.Rptr. at 349.

---

4. The *Eastwood* court balanced the defendant's interest in free expression against the plaintiff's interest in controlling commercial uses of his name that would adversely affect his career as a public figure: "Often considerable money, time and energy are needed to develop the ability in a person's name or likeness to attract attention and evoke a desired response in a particular consumer market. Thus, a proper accommodation between these competing concerns must be defined, since the rights guaranteed by the First Amendment do not require total abrogation of

Where the relief sought is damages, the plaintiff's property rights can be protected at minimal risk to free expression. *See Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). Where, as here, the plaintiffs ask the Court to impose a prior restraint, the risk to free expression is at its highest. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976); *Matter of Providence Journal Co.,* 820 F.2d 1342, 1350 (1st Cir.1986).

The words "promotion, marketing, and advertising" in this preliminary injunction therefore apply only to the use of the plaintiffs' names, likenesses or identities to sell the Tape. This limitation is required to prevent the imposition of a prior restraint on IEG's ability to comment on matters of public interest.

"Promotion, marketing, and advertising" are to be understood as a form of commercial speech, that is speech which "proposes a commercial transaction." *Board of Trustees of the State University of New York v. Fox,* 492 U.S. 469, 482, 109 S.Ct. 3028, 3036, 106 L.Ed.2d 388 (1989). This distinction between speech that proposes a commercial transaction, and speech that comments on matters of public interest has been applied regularly to distinguish protected speech from actionable misuse of a person's name or likeness for commercial gain. The Ninth Circuit recognized this distinction in an action for damages resulting from the use of a famous basketball player's name to sell cars: "While Lew Alcindor's basketball record may be said to be 'newsworthy,' its use is not automatically privileged. GMC used the information in the context of an automobile advertisement, not in a news or sports account." *Abdul–Jabbar v. General Motors Corp.,* 85 F.3d 407, 416 (9th Cir.1996); *see also, Midler,* 849 F.2d at 462. Other courts have recognized this distinction in enjoining commercial uses of a person's name, likeness or identity. *See Onassis v. Christian Dior–New York, Inc.,* 122 Misc.2d 603, 614, 472 N.Y.S.2d 254, 262 (N.Y.Sup.Ct.1984); *Ali,* 447 F.Supp. 723;

*Rosemont Enterprises, Inc. v. Urban Systems, Inc.,* 72 Misc.2d 788, 340 N.Y.S.2d 144 (N.Y.Sup.Ct.1973), *as modified,* 42 A.D.2d 544, 345 N.Y.S.2d 17 (1973); *see also, Shamsky v. Garan, Inc.,* 167 Misc.2d 149, 632 N.Y.S.2d 930 (N.Y.Sup.Ct.1995).

### D. *Right to Privacy*

██ California recognizes a tort cause of action for violation of the right to privacy. *See Diaz v. Oakland Tribune, Inc.,* 139 Cal. App.3d 118, 188 Cal.Rptr. 762 (1983). Four distinct torts are included under the rubric of right to privacy: (1) public disclosure of private facts; (2) intrusion upon the plaintiff's solitude or into his private affairs; (3) false light publicity; and (4) appropriation of the plaintiff's name and likeness. *Id.* at 767. The fourth branch of the tort is analyzed extensively above under the right to publicity claim. Michaels and Lee have also asserted the first and second branches of the privacy tort, public disclosure of private facts and intrusion into private affairs.

██ The elements of the tort of public disclosure of private facts are (1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern. *Id.* at 768. The elements of the tort of intrusion into private affairs are similar. The intrusion into private affairs need not be physical, and in order to be actionable must be offensive to a reasonable person. *See Aisenson v. American Broadcasting Co., Inc.,* 220 Cal.App.3d 146, 269 Cal.Rptr. 379, 387 (1990).

██ Both the public disclosure and intrusion torts are subject to a newsworthy privilege, which protects the First Amendment freedom to report on matters of public concern. *See Diaz,* 188 Cal.Rptr. at 767. Newsworthiness is defined broadly to include not only matters of public policy, but any matter of public concern, including the accomplishments, everyday lives, and romantic involvements of famous people. *See Eastwood,* 198 Cal.Rptr. at 350.

the right to privacy." *Eastwood,* 198 Cal.Rptr. at 350 (citations omitted) (internal quotation marks

omitted).

■ The privilege to report newsworthy information is not without limit. "Where the publicity is so offensive as to constitute a morbid and sensational prying into private lives for its own sake, it serves no legitimate public interest and is not deserving of protection." *Diaz*, 188 Cal.Rptr. at 767 (internal quotation marks omitted); *Virgil v. Time, Inc.*, 527 F.2d 1122, 1129 (9th Cir.1975); Restatement 2d Torts § 652D cmt. h.

### 1. Likelihood of Success on the Merits

Here, distribution of the Tape on the Internet would constitute public disclosure. The content of the Tape—Michaels and Lee engaged in sexual relations—constitutes a set of private facts whose disclosure would be objectionable to a reasonable person.

IEG makes three related contentions based on Lee's status as a "sex symbol." First, IEG contends that matters regarding sex should not be considered private with regard to Lee because her acting career is in part based on sex. Second, IEG contends that because a foreign Internet source has already released part of the Tape, the facts it contains are no longer private. Third, IEG contends that Lee's status as a sex symbol, and Michaels's status as a rock star make the sex acts depicted on the Tape newsworthy.

### a. Do Sex Symbols Have Privacy?

■ IEG contends that because Lee has appeared nude in magazines, movies and publicly distributed videotapes, the facts contained on the Tape depicting her having sex are no longer private. IEG's contention unreasonably blurs the line between fiction and reality. Lee is a professional actor. She has played roles involving sex and sexual appeal. The fact that she has performed a role involving sex does not, however, make her real sex life open to the public. *See Virgil*, 527 F.2d at 1131; *Briscoe v. Reader's Digest Ass'n*, 4 Cal.3d 529, 93 Cal.Rptr. 866, 869, 483 P.2d 34 (1971) (noting that even for non-actors, public life requires the assumption of various roles, and that "[l]oss of control over which 'face' one puts on may result in literal loss of self-identity [citations], and is humiliating beneath the gaze of those whose curiosity treats a human being as an object.").

IEG contends that the wide distribution of a different videotape, one depicting sexual relations between Lee and her husband Tommy Lee, negates any privacy interest that Lee might have in the Tape depicting sexual relations with Michaels. The facts depicted on the Tommy Lee tape, however, are different from the facts depicted on the Michaels Tape. Sexual relations are among the most personal and intimate of acts. The Court is not prepared to conclude that public exposure of one sexual encounter forever removes a person's privacy interest in all subsequent and previous sexual encounters.

It is also clear that Michaels has a privacy interest in his sex life. While Michaels's voluntary assumption of fame as a rock star throws open his private life to some extent, even people who voluntarily enter the public sphere retain a privacy interest in the most intimate details of their lives. *See Virgil*, 527 F.2d at 1131 ("[A]ccepting that it is, as matter of law, in the public interest to know about some area of activity, it does not necessarily follow that it is in the public interest to know private facts about the persons who engage in that activity."); Restatement 2d Torts § 652D cmt. h.

The Court notes that the private matter at issue here is not the fact that Lee and Michaels were romantically involved. Because they sought fame, Lee and Michaels must tolerate some public exposure of the fact of their involvement. *See Eastwood*, 198 Cal. Rptr. at 351. The fact recorded on the Tape, however, is not that Lee and Michaels were romantically involved, but rather the visual and aural details of their sexual relations, facts which are ordinarily considered private even for celebrities. For this reason, IEG's reliance on *Carlisle v. Fawcett Publications, Inc.*, 201 Cal.App.2d 733, 20 Cal.Rptr. 405 (1962), is misplaced. *Carlisle*, like *Eastwood*, involved publicity about the fact of a famous person's romantic involvement, as well as some of the details of that involvement. Neither case, however, involved graphic depictions of the most intimate aspects of the relationships.

In short, the Court concludes that the private facts depicted on the Michaels Tape

have not become public either by virtue of Lee's professional appearances as an actor, or by dissemination of the Tommy Lee videotape.

b. *Publication of a 148–Second Section of the Tape on the Dutch Internet Site*

 IEG presents evidence that a 148–second clip from the Tape was posted on the Internet on or about April 16, 1998. (Marrison Decl. Exs. K & J.) IEG contends that the publication of this clip converts the intimate activities depicted on the Tape to matters of public knowledge, and that, therefore, the plaintiffs no longer have a privacy interest to assert in the Tape. *See Lee v. Penthouse Int'l Ltd.*, 25 Med. L. Rptr. 1651, 1656 (C.D.Cal. 1997) (granting defendant's motion for summary judgment on claim for disclosure of private facts because photographs at issue had already been published); *Sipple v. Chronicle Publ'g Co.*, 154 Cal.App.3d 1040, 201 Cal.Rptr. 665 (1984) (holding that plaintiff's sexual orientation was no longer a private fact because it had previously been published).

In *Sipple* and *Lee*, however, all of the matters in which the plaintiffs asserted privacy were already well-known before the defendants re-published the information. Here, however, exposure of a small portion of the Tape began to occur ten days ago. The Court cannot conclude from this recent publication that the contents of the 148–second clip are now matters of public knowledge. Additionally, in *Sipple* and *Lee* the previously published information corresponded exactly to the information in which the plaintiffs asserted a privacy interest. *Sipple*, 201 Cal. Rptr. at 669; *Lee*, 25 Med. L. Rptr. at 1652. Here, the plaintiffs assert a privacy interest in all of the intimate activity depicted on the Tape. The plaintiffs' privacy interest in the unreleased portions of the Tape is undiminished.

The Court also notes that the ability of the plaintiffs to assert a privacy interest in the 148–second segment of the Tape does not affect the preliminary injunctive relief to which the plaintiffs are entitled. While the plaintiffs' privacy interest in the 148–second clip might be diminished, the plaintiffs' copyright in this portion of the Tape is unaffected. Any loss of privacy interest therefore provides no basis for relaxing this preliminary injunction's prohibition on copying, reproducing, publishing, disseminating, distributing or circulating the 148–second portion of the Tape. Additionally, prior publication of the 148–second segment does not negate the plaintiffs' right to exploit their names, likenesses, and identities for their own benefit. The publication of the 148–second segment therefore provides no basis for modifying the prohibition on marketing, advertising or promoting the Tape.

c. *Newsworthiness Privilege*

 In order to determine whether the contents of the Tape are covered by the privilege for reporting private but newsworthy information, the Court must balance (1) the social value of the facts published; (2) the depth of the intrusion into ostensibly private affairs; and (3) the extent to which the party voluntarily acceded to a position of public notoriety. *Diaz*, 188 Cal.Rptr. at 772; *Capra v. Thoroughbred Racing Ass'n of North America, Inc.*, 787 F.2d 463, 464 (9th Cir.1986). At trial or at summary judgment, the burden is on the plaintiffs to prove that the information they seek to protect is not newsworthy. *Diaz*, 188 Cal.Rptr. at 769.

 The first factor, the social value of the facts published, weighs against a finding of newsworthiness. It is difficult if not impossible to articulate a social value that will be advanced by dissemination of the Tape.

The second factor, depth of intrusion, also weighs against a finding of newsworthiness. This factor is to be applied with an eye toward community mores as to the depth of intrusion. *See Virgil*, 527 F.2d at 1131. At trial, it will be for the finder of fact to determine the state of community mores regarding the depth of intrusion. *Id.* For purposes of this motion, the Court determines that the plaintiffs are likely to convince the finder of fact that sexual relations are among the most private of private affairs, and that a video recording of two individuals engaged in such relations represents the deepest possible intrusion into such affairs.

The third factor, voluntary accession to fame, weighs in favor of a finding of newsworthiness. Michaels and Lee declare that they have cultivated fame throughout their careers. (Michaels Decl. (Mar. 6, 1998) ¶¶ 2–3; Lee Decl. (Apr. 10, 1998) ¶¶ 2–3.) In Lee's case, her fame arises in part from television and movie roles based on sex and sexual appeal.

The first two factors weigh heavily against a finding of newsworthiness for the contents of the Tape. The third factor weighs somewhat in favor of a finding of newsworthiness for the contents of the Tape. Weighing the factors together, the Court concludes that the plaintiffs have demonstrated a likelihood of success in meeting their burden to show that the contents of the Tape are not covered by the newsworthiness privilege.

■ The Court notes, however, a critical distinction which IEG has attempted to blur in its papers. The fact that the Tape exists and that it is the focus of this dispute is newsworthy. While the fact of the Tape's existence is somewhat intrusive into the plaintiffs' privacy, this intrusion is outweighed by the strong public interest in litigation concerning individuals' right to privacy. Although this preliminary injunction prohibits IEG from violating the plaintiffs' right to privacy by disseminating the contents of the Tape, the injunction does not restrict IEG's ability to participate in public discussion about the Tape or this litigation.

### 2. *Irreparable Injury*

■ By definition, an actionable disclosure of private facts must be highly offensive to a reasonable person. The injury inflicted is therefore to the plaintiffs' "human dignity and peace of mind." 2 McCarthy § 11.7[A]. Although monetary damages are available for such injuries, they are difficult to quantify, and such injuries are to some extent irreparable. Furthermore, the privacy of the acts depicted on the Tape cannot be restored by monetary damages after the Tape becomes public. The nature of the Internet aggravates the irreparable nature of the injury. Once the Tape is posted on IEG's web site, it will be available for instant copying and further dissemination by IEG's subscribers.

■ In light of the foregoing, the Court concludes that the plaintiffs are entitled to a preliminary injunction prohibiting the dissemination of the Tape in order to prevent a violation of the plaintiffs' state law right of privacy in the contents of the Tape.

### E. *Bond*

■ Michaels requests that the Court vacate the $50,000 bond based on his showing of a strong likelihood of success on the merits, and based on the contention that any profits lost by IEG would represent the fruits of unlawful infringement.

Federal Rule of Civil Procedure 65(c) provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

The Ninth Circuit has approved waivers of the bond requirement or imposition of only a minimal bond where impecunious public interest organizations seek to enforce rights protected by the private attorney general clauses of statutes dealing with matters of public interest. *See People ex. rel. Van De Kamp v. Tahoe Regional Planning Agency,* 766 F.2d 1319, 1325 (9th Cir.1985); *Friends of the Earth, Inc. v. Coleman,* 518 F.2d 323, 325 (9th Cir.1975). The Court does not find such circumstances to be present here.

The plaintiffs are correct in asserting that if IEG in fact has no license to distribute the Tape, the only losses it will suffer are lost profits from unlawful infringement. IEG's defense, however, is that it has a license to the Tape. In the unlikely event that IEG prevails on this defense, the losses suffered from the injunction will not be lost profits from infringement, but rather lost profits from activity that Michaels or Lee had authorized it to undertake. The Court finds that the $50,000 bond accurately reflects the losses that IEG will suffer if it is erroneously enjoined from using its purported license, discounted by the probability that it actually

has such a license. *See International Controls Corp. v. Vesco,* 490 F.2d 1334, 1356 (2nd Cir.1974) (noting that district court may consider likelihood of harm to the enjoined party in setting the amount of bond); *Northwestern Bell Tel. Co. v. Bedco of Minn., Inc.,* 501 F.Supp. 299, 304 (D.Minn.1980) (waiving bond based on strength of the plaintiff's case for copyright infringement).

Because, however, Lee now also benefits from the injunction, the Court will require Lee to share the cost. The bond required from Michaels is reduced to $25,000. Lee must give security in the amount of $25,000.

### III. Conclusion

The Court has determined that the plaintiffs have established a likelihood of success on the merits of their actions for copyright infringement, violation of the right to publicity and violation of the right to privacy.

IT IS HEREBY ORDERED that, pending final judgment or dismissal of this action, defendant IEG and its agents, officers, employees, attorneys, and those acting in concert with them are temporarily restrained from:

1. Selling, attempting to sell, causing to be sold, permitting any other individual or entity to sell, copying, reproducing, preparing derivative works, publishing, disseminating, distributing, circulating, promoting, marketing, and advertising of the Michaels/Lee videotape (the "Tape");

2. Selling, attempting to sell, causing to be sold, permitting any other individual or entity to sell, copying, reproducing, preparing derivative works, publishing, disseminating, distributing, circulating, promoting, marketing, and advertising of still photographs from the Tape, captured images from the Tape displayed on the Internet, and/or any downloaded hard copies of images from the Tape;

3. Selling, attempting to sell, causing to be sold, permitting any other individual or entity to sell, copying, reproducing, preparing derivative works, publishing, disseminating, distributing, circulating, promoting, marketing, and

advertising of all advertising, promotional material, or packaging referring to the Tape;

4. Taking orders for copies of the Tape through the Internet or any other means;

5. Shipping copies of the Tape to those purchasers who already have placed orders for copies of the Tape, or to anyone else; and

6. Using Michaels's or Lee's name, likeness or identity in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services.

A bond in the amount of $50,000 shall be deemed adequate security for the payment of such costs and damages that may be incurred by the defendants if the relief herein is found to have been improvidently granted. Lee is directed to provide security for one-half of the $50,000 bond.